**PEREGRINE MYANMAR LTD. and Peregrine Capital Myanmar Ltd., Plaintiffs–Appellees,**

v.

**Miriam Marshall SEGAL, Defendant–Appellant.**

No. 1668, Docket 96–7030.

United States Court of Appeals, Second Circuit.

Argued June 3, 1996.

Decided June 28, 1996.

Russell E. Brooks, Milbank, Tweed, Hadley & McCloy, New York City (Eugene F. Farabaugh, New York City, on the brief), for Plaintiffs–Appellees.

Bruce S. Kramer, Borod & Kramer, Memphis, TN (Joseph M. Koury, Memphis, TN on the brief), for Defendant–Appellant.

Before FEINBERG, JACOBS and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

Two companies based in Myanmar (formerly Burma) sued Miriam Marshall Segal, a former officer and director of both companies, for breach of contract, breach of fiduciary duty, unfair competition, and "tortious interference with prospective economic advantage." They asked for damages and an injunction. After a one-day hearing, the district court granted a permanent injunction enjoining Segal from, among other things, interfering with the plaintiffs' business interests in Myanmar, and ordering her to publicize that (as the district court found) she no longer had a stake in the plaintiffs' business interests.

Segal makes three arguments on appeal: (i) her forum non conveniens motion should have been granted, because most of the critical evidence and witnesses are in the Far East; (ii) her motion to dismiss under Rule 12(b)(7) should have been granted, because the Myanmar Ministry of Fisheries is an indispensable, but non-joinable, party; and (iii) the injunction is overbroad, vague, and a violation of her First Amendment rights. We affirm the district court on the first two grounds. As to the injunction, we uphold nine of its eleven paragraphs, vacate the other two as vague and overbroad, and remand to the district court so that it may determine whether one of these two paragraphs should and can be recast.

## I. FACTS

Miriam Marshall Segal, American citizen and New York City resident, developed substantial contacts with government officials and business leaders in Myanmar over a 20–year period. At various times, she has owned several companies that do business in Myanmar, including MMA International Holdings (MMAI), incorporated in the British Virgin Islands, and its subsidiary MMA Financo Fisheries Co. Ltd. (MMAFFCL), incorporated in Hong Kong. In 1990, MMAFFCL entered into a joint venture agreement with the Myanmar Ministry of Livestock Breeding and Fisheries (the Ministry) to catch and export fish from Myanmar's coastal waters. The agreement creates a new entity called Myanmar American Fisheries Company (MAFCO), half owned by the Ministry (designated "party A") and half owned by MMAFFCL ("party B"). The agreement places restrictions on the ability of both partners to transfer their interests in MAFCO.

In June 1994, Peregrine Myanmar Limited (PML), an investment company with operations in Myanmar and Hong Kong, entered into a share acquisition agreement with MMAI, Segal's holding company, to buy MMAFFCL, the subsidiary. The agreement was made "subject to [PML] receiving evidence satisfactory to it that the sale and purchase of the Shares provided for herein will not affect adversely the validity and enforceability of the joint venture agreement ... relating to [MAFCO]...." PML presumably received such evidence, since it took no steps to cancel the sale of the shares. Incident to the sale of MMAFFCL, Segal was given a ten percent ownership stake in PML.

One month after the sale of MMAFFCL, PML entered into a three-year employment agreement with Segal in which she was made Executive Chairman of MAFCO, PML, and Peregrine Capital Myanmar (PCM). (PML and PCM share the same parent company and generally operate as partners in their Myanmar investment activities.) Her primary responsibility was to "maintain[ ] and build[ ] relationships at the senior levels of the Myanmar Government Ministries and business community." The agreement stressed that Segal had "the responsibility of closely coordinating with the Managing Di-

rector, PCM to ensure that projects she init[i]ates are properly structured and closely coordinated with the investors' objectives." The agreement barred Segal from using or sharing confidential information related to PML, PCM, MMAFFCL, or MAFCO that she might acquire as Executive Chairman of the various companies for her own benefit or the benefit of any other person. PML was given the right to terminate Segal "for cause or some fundamental dispute between [her] and [PML's] major shareholder which cannot be reconciled."

In June 1995, one year after entering into the employment contract, PML learned that Segal had been scheming to create losses for MAFCO that would devalue the company and (she hoped) induce PML to market its interest in MAFCO at an artificially low price.[1] In detailed discussions with Mitsui (a large Japanese company) and with government officials in Myanmar, Segal had apparently arranged for Mitsui to buy PML's interest in MAFCO if PML indeed decided to sell its MAFCO interest. Segal had also indicated to her contacts in the Myanmar government that they should help Mitsui and should disfavor PML and PCM (together "Peregrine" or "the plaintiffs").

The plaintiffs learned about Segal's scheme by accident. Segal instructed her personal secretary in New York (hired and paid by PML's parent company) to fax a memorandum outlining the plot to Mitsui's Hong Kong office. Instead, she mistakenly faxed it to the Hong Kong office of the plaintiffs' parent company. Officers from the parent company hurried to New York, searched the secretary's computer (with the secretary's consent), and retrieved other memoranda written by Segal that documented her scheme. After learning of Segal's intrigue, PML fired her for cause on July 10, 1995. The plaintiffs claim that Segal then began a campaign to undermine their ability to run MAFCO by telling MAFCO employees (i) that she was still in control of the privately-controlled half of MAFCO, (ii) that they should only obey instructions from her, (iii) that they should ignore purchase orders and other instructions from PML, and (iv) that Myanmar government officials would prosecute any PML or PCM employee who entered MAFCO facilities. For instance, days after Segal's termination, Hector Lwin, PCM's Executive Director and an American citizen, was expelled from Myanmar for travelling in the country without carrying his passport. (He apparently had left his passport in his office in another part of the country.) One month earlier, Segal had recommended that General Maung Maung expel Lwin, and suggested a passport violation as a likely pretext.[2]

At this point, PML understandably became concerned that Myanmar government officials might challenge or deny PML's 50% interest (through MMAFFCL, the "party B" signatory) in the MAFCO joint venture. On August 3, PML wrote to the Ministry of Fisheries "setting out the circumstances that led to the change in ownership" in MMAFFCL. On September 12, the Ministry responded, stating merely that a party to the joint venture agreement that "wanted to transfer its share" must comply with the transferability limitations set out in the joint venture agreement. The Ministry stated that it had called a meeting of the MAFCO Board of Directors to discuss the matter and to take any "necessary action." Significantly, the Ministry's letter acknowledged MMAFFCL's status as party B to the joint venture.

Two weeks later, on September 27, PML and PCM brought this suit against Segal in the Southern District of New York. The complaint has five counts, four of which allege substantive claims against Segal: (i) breach of her employment contract by "soliciting and acting on behalf of competitors of plaintiffs" and "deliberately attempt[ing] to damage plaintiffs' business opportunities in Myanmar so that plaintiffs' competitors could

1. Whether PML had the authority under the joint venture agreement to sell its interest in MAFCO is not clear on this record.

2. Letter of June 13, 1995 from Segal to Brig. Gen. Maung Maung ("My dear General, Regarding Hector, why can't his visa revocation be implemented—undesirable citizen, mistreatment of local staff, suspicion of illegal actions, too many lost passports, etc. My job is difficult enough without his undermining everything.").

profit thereby"; (ii) breach of her fiduciary duty to PML and PCM as an officer and director of those companies; (iii) "common law unfair competition"; and (iv) "tortious interference with prospective economic advantage" by "interfering in the business relationship existing between [Peregrine] and MAFCO . . . for the sole purpose of harming [Peregrine and its] interest in MAFCO." The fifth count repeats the allegations that make up the four substantive claims and alleges that the plaintiffs are "entitled to a permanent injunction to restrain the conduct complained about in this complaint." The complaint seeks compensatory and punitive damages of at least $20 million, and a preliminary and permanent injunction that would enjoin Segal from interfering with plaintiffs' business interests in Myanmar in specified ways.

On the day the complaint was filed, the district court issued a temporary restraining order barring Segal from taking the specified actions listed in the complaint, and scheduled a hearing on the issue of whether the restraining order should be converted into a preliminary injunction. At the hearing, on October 11, the court explained that the preliminary injunction hearing would also constitute a hearing or trial on the merits of whether to grant a permanent injunction. The day after the hearing, the court extended the duration of the restraining order indefinitely.[3]

3. After the restraining order was extended but before the permanent injunction issued, the district court declared that Segal had violated the order by instituting criminal defamation proceedings in Myanmar against two directors of PML and PCM. Faced with a contempt citation and a $25,000 fine for every day that passed without her discontinuing the Myanmar action, Segal promptly discontinued the suit.

4. Segal admits on appeal that she is domiciled in New York (which the evidence supports) and that the district court therefore had subject matter jurisdiction over the case. PML is incorporated in the British Virgin Islands and PCM is incorporated in Myanmar. Both have their principal places of business in Myanmar. There is therefore complete diversity between the parties.

5. Based on certain factual findings and legal conclusions, we conclude that the district court, in ruling for the plaintiffs on count 5 (which re-

Segal then moved to dismiss the plaintiffs' complaint on two of the grounds at issue here (forum non conveniens and failure to join an indispensable party), and on the ground that the court lacked subject matter jurisdiction because she was domiciled in Yangon, Myanmar, not at her apartment on Central Park West in Manhattan.[4] On December 5, the district court issued an opinion denying her motion on all three grounds. On December 7, the court granted final judgment to the plaintiffs on Count 5 of their complaint (demanding injunctive relief) and issued a permanent injunction that incorporated the terms of the restraining order and added several others.

In connection with the final judgment, the court also issued findings of fact and conclusions of law.[5] In relevant part, the court found that Segal had "schem[ed] to subvert Peregrine's position in Myanmar," continued to hold herself out as a director of MAFCO, and "has caused MAFCO officers and employees who had been employed by Peregrine to be replaced and barred from MAFCO facilities." The court concluded under Hong Kong law that the June 1994 acquisition agreement validly transferred the ownership of MMAFFCL from MMAI to PML. As to the issue of control over MAFCO, the court concluded that:

- MMAFFCL is the private 50% partner ("party B") to the MAFCO joint venture agreement;

alleges the prior claims and seeks injunctive relief), implicitly ruled that Segal is liable on all four substantive causes of action alleged by the plaintiffs. For instance, the court found that "Segal began conducting correspondence with representatives of Mitsui & Co., the Japanese conglomerate, . . . that reveals that Segal was scheming to subvert Peregrine's position in Myanmar." This supports a finding of liability on the breach of contract, breach of fiduciary duty, and unfair competition claims. In addition, the conclusion that "Segal has wrongfully interfered with [the plaintiffs'] interest, through MMAFFCL, in MAFCO," supports a finding of liability on the "tortious interference with prospective economic advantage" claim. Proceedings are continuing in the district court on (i) the measure of damages for the illegal acts and (ii) any counterclaims brought by Segal.

- "PML, not Segal, owns MMAFFCL"; and
- "PML is entitled, through MMAFFCL, to enjoy the rights and privileges to which the joint venture 'party B' is entitled."

The court did not try to define the extent of party B's "rights and privileges" under the joint venture agreement, and did not rule out the possibility that these rights and privileges amount to nothing. The court did conclude, however, that "Segal has wrongfully interfered with [PML's] interest, through MMAFFCL, in MAFCO," whatever that interest is or may turn out to be.

On appeal, Segal challenges the denial of her motion to dismiss and the final judgment that contains the permanent injunction. She raises three issues: (a) forum non conveniens, (b) failure to join an indispensable party, and (c) the scope of the injunction.

## II. FORUM NON CONVENIENS

■ A forum non conveniens motion is decided in two steps. First, the district court asks if there is an alternative forum that has jurisdiction to hear the case. Segal claims that Hong Kong is a superior forum to New York, and the plaintiffs do not dispute that Hong Kong courts would have jurisdiction over the parties. We therefore move to the second step of the inquiry, in which the district court determines the forum that will be most convenient and will best serve the ends of justice. In making this second determination, the court weighs a variety of private and public considerations, as set out in *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947) (the "*Gilbert* factors"). *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 241, 102 S.Ct. 252, 258, 70 L.Ed.2d 419 (1981); *Scottish Air Int'l, Inc. v. British Caledonian Group, PLC,* 81 F.3d 1224, 1232 (2d Cir.1996); *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 293 (2d Cir.1996); *R. Maganlal & Co. v. M.G. Chemical Co.,* 942 F.2d 164, 167–68 (2d Cir. 1991); *Schertenleib v. Traum,* 589 F.2d 1156, 1159–60 (2d Cir.1978).

■ Appellate review of a forum non conveniens decision is extremely limited. We have said that the decision "lies wholly within the broad discretion of the district court" and should be reversed only if "that discretion has been clearly abused." *Scottish Air,* 81 F.3d at 1232. There can be a "clear abuse of discretion" only if "a court fails to carefully consider[ ] the *Gilbert* factors." *Allstate Life Ins. Co. v. Linter Group Ltd.,* 994 F.2d 996, 1001 (2d Cir.) (internal quotations omitted), *cert. denied,* —— U.S. ——, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). Here, the district court carefully considered the appropriate public and private interest factors before concluding that New York was a proper forum. There was thus no "clear abuse of discretion."

■ In weighing the *Gilbert* factors, the court starts with a presumption in favor of the plaintiff's choice of forum, especially if the defendant resides in the chosen forum, as here. *Maganlal,* 942 F.2d at 167; *Schertenleib,* 589 F.2d at 1164. The defendant has the burden of overcoming this presumption by establishing that the *Gilbert* factors "tilt[ ] strongly in favor of" the alternative forum. *Maganlal,* 942 F.2d at 167. *See also Schertenleib,* 589 F.2d at 1160. The district court recognized this presumption and the heavy burden shouldered by Segal in seeking another forum.

■ Turning to a consideration of the *Gilbert* factors, the court specifically considered three of the five private interest factors. As to (1) the "relative ease of access to sources of proof" and (2) "the cost of obtaining attendance of willing [ ] witnesses," *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843; *Scottish Air,* 81 F.3d at 1232, the court explained that the principal witnesses would be Peregrine personnel. Some of these witnesses, including Segal's one-time secretary, reside in New York; although others reside in the Far East, the plaintiffs have promised to pay the travel costs for Peregrine personnel in Asia. The only non-Peregrine employee identified by Segal as a potential witness is the Mitsui employee in Hong Kong who is alleged to have been party to the scheme. Though Segal makes much of the fact that a New York forum entails transoceanic travel for some people, the district court pointed out that "[w]herever the trial takes place, witnesses will be forced to travel to provide

testimony." As to documentary evidence, the court concluded that the critical documents were the memoranda faxed by Segal from New York to Hong Kong and Myanmar. These documents are located in New York, as are the witnesses who might authenticate them (Segal and her secretary).[6]

Turning to factor (3), the enforceability of judgments, *see Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843, the court found that Segal's "significant ties to New York" and her "lack of contacts with Hong Kong" meant that a New York judgment would be more meaningful than a Hong Kong judgment. We agree.

The private interest factors not mentioned by the district court in its opinion are (i) the "availability of compulsory process for attendance of unwilling" witnesses, and (ii) "practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert,* 330 U.S. at 508, 67 S.Ct. at 843; *Scottish Air,* 81 F.3d at 1232. As to the first, neither side claims that any witness will be unwilling to testify. As to the second, Segal points out that, at the same time the plaintiffs began this litigation, Peregrine commenced suit in Hong Kong against Segal's alleged co-schemer at Mitsui and one of Peregrine's ex-directors (both Hong Kong residents) predicated on similar facts. But she does not specify what "practical problems" she foresees from this dual progress of suits against different defendants residing on different continents. Nor can she articulate why the pendency of the Hong Kong suit would make it more expensive or difficult for the district court to proceed with the suit against her, a New York resident. In sum, the private interest factors do not tilt strongly in favor of Hong Kong as an alternative forum, and in fact seem to tilt toward New York as the appropriate forum.

As to the public interest factors, the district court carefully considered each of the four factors listed by the Supreme Court in *Gilbert.* First, there were no "administrative difficulties stemming from court congestion,"

*Scottish Air,* 81 F.3d at 1232, because the court can accommodate this case on its docket. Second, although Hong Kong has a "local interest [protecting its corporations from wrongdoing] in having localized controversies decided at home," *id.* (internal quotations omitted), New York has a countervailing "strong interest in this litigation" since Segal lives here and critical events took place here. This means that the third factor, "imposing jury duty upon the people of a community which has no relation to the litigation," *id.* (internal quotations omitted), is not implicated.

■ Consideration of the fourth factor—"the appropriateness of holding the trial in a forum that is at home with the applicable law, rather than having a court untangle problems in conflict of laws, and in law foreign to itself," *id.* (internal quotations omitted)—may be a bit more elaborate. But even if this case raises complicated choice of law questions and requires the exclusive application of foreign law as suggested by Segal, "it is well-established that the need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens." *Maganlal,* 942 F.2d at 169. Moreover, it is not at all clear that Hong Kong would have an advantage in this respect, because Myanmar commercial law may control some or all of the claims. And even if this factor weighs in favor of Hong Kong, it does not outweigh the other eight factors which as a whole tilt decidedly toward the New York forum. It is therefore apparent that Segal cannot carry her burden of making the opposite showing—that the balance of factors tilts strongly toward Hong Kong.

The district court has carefully considered the *Gilbert* factors. Its denial of Segal's motion to dismiss on forum non conveniens grounds is therefore affirmed.

### III. JOINDER OF AN INDISPENSABLE PARTY

■ Segal also moved to dismiss the complaint under Rule 12(b)(7) ("failure to join a

---

6. Segal suggests that New York is not a convenient forum for her as a witness, because "[d]espite her occasional presence in New York, [she] spends a great deal of her time working in Myan-

mar." This is spurious, since her home is in New York and there is no indication that it is inconvenient for her to be in New York.

party under Rule 19"). She argues that under Rule 19(a) the suit cannot proceed without the Myanmar Ministry of Fisheries, that joinder of the Ministry is not feasible, and that the suit must therefore be dismissed under Rule 19(b). The district court held that the Ministry did not need to be joined under Rule 19(a) and denied Segal's motion. This ruling was correct.

Rule 19(a) sets out two situations in which joinder of a party is compulsory:

(1) in the person's absence complete relief cannot be accorded among those already parties, or

(2) [A] the person claims an interest relating to the subject of the action and

[B] is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

The key issue in deciding whether either part of Rule 19(a) applies is the extent to which this case requires a determination of rights and interests under the MAFCO joint venture agreement, to which the Ministry is a party. Segal says that this case necessarily determines rights under the MAFCO joint venture agreement; the plaintiffs say that this case is merely about an employment contract and has nothing to do with the MAFCO joint venture agreement.

Neither position is entirely convincing. The plaintiffs' claim for "tortious interference with prospective economic advantage" alleges that Segal is interfering with the plaintiffs' interest (through MMAFFCL) in MAFCO. Deciding whether Segal interfered with that interest entails a decision about whether the plaintiffs actually have an interest in MAFCO, a point that Segal disputes on two alternate grounds: (i) the acquisition agreement in which MMAI transferred MMAFFCL's shares to PML was invalid, and (ii) that transfer violated the joint venture agreement, rendering MMAFFCL's interest in MAFCO void.

The first issue requires an interpretation under Hong Kong law of the June 1994 acquisition agreement between PML and MMAI. The district court undertook such an interpretation and concluded that the transfer of ownership was valid. The court then concluded that: "MMAFFCL is the 'party B' to the MAFCO joint venture agreement; PML, not Segal, owns MMAFFCL; [and] PML is entitled, through MMAFFCL, to enjoy the rights and privileges to which the joint venture 'party B' is entitled." To draw these conclusions, the court had to have looked at the joint venture agreement and construed it, but only to identify the parties to the agreement (MMAFFCL and the Ministry) and the labels given the parties by the agreement ("parties A and B"). Other than that, the court drew no conclusions (and was not called upon to draw any conclusions) as to whether the sale of MMAFFCL bears upon the rights of parties A and B *vis à vis* each other. Rather, the court's conclusions rested almost entirely on its determination that the MMAFFCL share acquisition agreement was valid.

Thus, the court did not address the second issue raised by Segal: whether the transfer of MMAFFCL ownership was permissible under the joint venture agreement or affected the rights of the parties under it. At this point, party A's rights have not been prejudged, and party B's rights have not been determined. All that the district court has decided is that MMAFFCL, which was indubitably the party B signatory, was acquired by PML. As owner of party B, PML may have a bonanza or a headache, but the district court has not decided or influenced that result.

As a result, Segal's arguments fail under both parts of Rule 19(a). "[C]omplete relief" can be accorded even without the Ministry, because nothing in the district court's statements or final judgment requires the Ministry to do anything or change any of its positions. Segal claims (without documentary support) that the Ministry insists that she (individually) is party B. Although the district court's conclusions of law contradict this assertion, those conclusions do not prejudice

the Ministry's right to make this argument in the courts of Myanmar (or elsewhere) when the plaintiffs (or the Ministry) attempt to determine "the rights and privileges to which the joint venture 'party B' is entitled."[7] Since the district court did not say what this entitlement is, the Ministry remains free to argue that the plaintiffs have no interest in the joint venture or that it is dissolved. We do not consider, much less determine, the possible consequences of any such stance by the Ministry or by Myanmar's courts, under the law of any jurisdiction or under international law. In short, the scope of the relief provided by the district court (which the plaintiffs consider "complete," at least at this stage of the proceedings) remains the same regardless of any initiative or position the Ministry may take.

As to the second part of Rule 19(a), Segal's argument fails here if only because the Ministry has not "claim[ed] an interest relating to the subject of the action." Segal's attempt to assert on behalf of the Ministry its supposed concern about the dilution of its interest in MAFCO falls outside the language of the rule. It is the absent party that must "claim an interest." *See Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043 (9th Cir.1983) (satisfying the second prong of Rule 19(a) is "contingent [ ] upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action"), *cert. denied*, 464 U.S. 849, 104 S.Ct. 156, 78 L.Ed.2d 144 (1983); Wright, Miller, and Kane, *Federal Practice and Procedure*, § 1604 at 49 (2d ed. 1986).

In addition, nothing in the court's analysis or judgment "impairs" the Ministry's "ability to protect [its] interest" in MAFCO, as discussed above. Nor does the Ministry's absence present a "substantial risk" that any of the parties will "incur[ ] double, multiple, or otherwise inconsistent obligations." Segal claims that the district court's decision declaring PML (through MMAFFCL) to be party B is inconsistent with the Ministry's supposed "decision" that it is Segal who is

party B. However, Segal cannot dispute that the joint venture agreement is in terms between the Ministry and MMAFFCL rather than between the Ministry and her as an individual. The present dispute thus focuses on the MMAFFCL acquisition agreement. If it is invalid, then one might conclude that Segal (through MMAFFCL) is in effect party B. But this issue turns on the interpretation of the acquisition agreement between PML and Segal's holding company (MMAI), an agreement to which the Ministry was not a party. The construing of this agreement therefore has nothing to do with the Ministry's position on the matter, or its presence in this lawsuit. *See Northrop*, 705 F.2d at 1044 ("A nonparty to a commercial contract ordinarily is not a necessary party to an adjudication of rights under the contract.... This rule is not inapplicable merely because the absent party happens to be the Government.").

The district court was correct in ruling that joinder of the Ministry was not required under Rule 19(a). We therefore affirm the court's denial of Segal's motion to dismiss on this ground.

## IV. SCOPE OF THE INJUNCTION

### A. The injunction and general principles

The injunction enjoins Segal from taking eight actions and commands her to take three others:

Segal is permanently restrained and enjoined from:

1. trying to intimidate plaintiffs' officers, directors, employees and agents in the exercise of their duties with threats of spurious lawsuits, provided that nothing in this Final Judgment shall be deemed to impinge upon or to impede Segal's right to interpose all legitimate counterclaims;

2. importuning military or civilian officials of the Government of Myanmar to (a) "raid" the houses of, (b) "pin something on", or (c) otherwise to "frame" or to contrive legal difficulties for

---

7. If Segal is right that the Ministry wishes to make such a claim in the future, it may be handicapped by its letter of September 12 to

PML in which it acknowledged that MMAFFCL was "party B." *See supra* section I.

plaintiffs' officers, directors, employees and agents;

3. interceding with military or civilian officials of the Government of Myanmar with the purpose of causing interference with plaintiffs' business or with plaintiffs' interest in MAFCO;

4. involving or engaging herself in any fashion in MAFCO's management or operations, including by (a) holding herself out as a director or officer of MAFCO or (b) communicating with MAFCO's officers, directors, employees and agents on matters pertaining to MAFCO or plaintiffs;

5. interfering or procuring others to interfere with the business interests of plaintiffs in MAFCO and MMAFFCL;

6. disparaging or casting doubt on plaintiffs' beneficial interest in MAFCO;

7. communicating confidential information obtained in the course of her employment with plaintiffs relating to the business, affairs, products or processes of plaintiffs, MAFCO or MMAFFCL to other business entities;

8. working alone or in concert with others to loot MAFCO, including (without limitation) by causing the disposal, wasting or below-market value sale of MAFCO's assets;

Segal is enjoined and commanded to:

9. inform (a) all appropriate individuals (including any individual claiming or holding office or board membership in MAFCO under purported authority derived from or delegated by her) and (b) the appropriate officials of the Government of Myanmar and of that Government's Department of Fisheries that: she has no interest (other than as shareholder of PML) in MMAFFCL or MAFCO, and no person may claim authority emanating from her either in MMAFFCL or in MAFCO;

10. take all other reasonably needful actions to facilitate plaintiffs' resumption of their management authority in MMAFFCL or in MAFCO; and

11. place advertisements in two specific Yangon newspapers retracting the advertisement placed by her Yangon barrister in these newspapers in September 1995, in which it was claimed that Segal is co-partner of MAFCO, such retractions to be of size and placement similar to those of the original advertisements.

Segal raises four challenges to the scope of the injunction: (i) paragraphs 1, 4, 6, 9, 10, and 11, as well as "all other [provisions] which deal with the ownership of MMAFFCL or MAFCO" (*i.e.*, paragraphs 3, 5, 7, and 8), are not "narrowly tailored" to redress the specific legal violations at issue in this case; (ii) paragraph 10 is vague, in violation of Rule 65(d) of the Federal Rules of Civil Procedure; (iii) paragraph 1 is overbroad, in violation of both the First Amendment and Rule 65(d); and (iv) paragraphs 4 and 6 violate her free speech rights under the First Amendment. Thus, ten of the eleven are challenged on "narrowly tailored" grounds, and four of those ten (1, 4, 6, and 10) are challenged on one other ground as well.

We have held that "[i]njunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Publishing Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir.1994). This requires us to delineate the "specific legal violations" in this case. Segal claims that the scope of the case was defined in the district court's December 5 opinion, which stated that "[t]his litigation does not concern ownership of shares *in MAFCO*." (Emphasis added.) Yet, argues Segal, the injunction "clearly implicate[s] the same proper ownership *of MMAFFCL and MAFCO* that the lower Court says is not part of this case." (Emphasis added.)

Segal is putting words in the mouth of the district judge and truncating the issues in this case. The ownership of MMAFFCL is very much at issue here. As to the "ownership of shares in MAFCO," that is not at issue because, for purposes of this case, it can be determined by a glance at the joint venture agreement: 50% of the shares are owned by MMAFFCL; MMAFFCL has never transferred those shares; thus, MMAFFCL still owns 50% of the shares in MAFCO. (As discussed above, this does not

rule out the possibility that the transfer of MMAFFCL ownership violated the MAFCO agreement, thus giving the Ministry a claim for relief and rendering party B's stake in MAFCO worthless.) The ownership of the 50% stake in MAFCO therefore boils down to who owns MMAFFCL, a question the district court answered by finding that the acquisition agreement between PML and MMAI is valid. This finding (along with the findings pertaining to Segal's scheme) apparently allowed the plaintiffs to attain victory on all four of their claims: (i) breach of contract, (ii) breach of fiduciary duty, (iii) unfair competition, and (iv) tortious interference with prospective economic advantage. These four claims set the boundaries for the injunctive relief. To the extent that the injunction commands or enjoins actions that remedy these four violations of law, the injunction is sufficiently narrow.

*B.  Individual Paragraphs*

■ (1) Segal challenges paragraph 1, which bars threats of "spurious" (false or bogus) lawsuits, as not "narrowly tailored" and as overbroad under both Rule 65(d) (which requires that injunctions be "specific in terms") and the First Amendment. Courts have the power to enjoin baseless lawsuits. *United States v. International Broth. of Teamsters,* 899 F.2d 143, 146–47 (2d Cir.1990); *Meyerson v. Werner,* 683 F.2d 723, 728 (2d Cir.1982) (per curiam). But under Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law. *See Sterling Drug, Inc. v. Bayer AG,* 14 F.3d 733, 748 (2d Cir. 1994); *Hughey v. JMS Dev. Corp.,* 78 F.3d 1523, 1531 (11th Cir.1996); *Epstein Family Partnership v. Kmart Corp.,* 13 F.3d 762, 771 (3d Cir.1994). Segal makes the valid point that it will be impossible for her—a non-lawyer—to know in advance which "threatened" lawsuits are "spurious" and which are not. The plaintiffs defend this provision simply by asserting that it "is very narrow, and it is not vague," and postulate a specific threat that Segal might make:

> It would bar, hypothetically, letters to Terry Dukes [Segal's secretary who accidentally faxed the inculpatory memorandum to

the wrong place] from Segal's lawyer which threaten charges of theft

> . . . .

We take no position on whether the circumstances justify an injunction to bar this particular (albeit hypothetical) threat. But we do not think that this one hypothetical concern supports a general restriction on Segal's assertion of legal rights, even as narrowed to bar the invocation of legal rights that are "spurious." We therefore vacate paragraph 1 as overbroad under Rule 65(d) and remand to the district court so that it may recraft the paragraph more narrowly. On remand, the plaintiffs may want to define more specifically the types of lawsuits that, based on the district court's legal conclusions, would be "spurious."

Because we find paragraph 1 overbroad under the Federal Rules, we do not consider whether a broad ban on mere threats to sue violates the First Amendment in these circumstances. While we do not suggest, much less prescribe, the language that might be appropriate in the circumstances presented, and we leave this determination to the district court, we note that the parties may obviate this issue by agreeing to an injunction that focuses on the act of suing rather than on the "threat" to sue.

(2) Segal does not challenge paragraph 2.

■ (3) Segal claims that paragraph 3, which enjoins her intercession with Myanmar officials in an effort to interfere with "plaintiffs' business *or* plaintiffs' interest in MAFCO" (emphasis added), is not "narrowly tailored." If the broad term "plaintiffs' business" is construed to refer to only the plaintiffs' present business in Myanmar and the opportunities that PML undertook to acquire by purchasing the party B signatory to the MAFCO joint venture, then this paragraph falls within the plaintiffs' tortious interference and unfair competition claims. We so construe it, and therefore uphold the paragraph.

■ (4) Segal challenges paragraph 4 on both "narrowly tailored" and First Amendment grounds. She claims that the paragraph's ban on "communicating with MAFCO's officers, directors, employees, and

agents on matters pertaining to MAFCO or plaintiffs" is vastly overbroad and would prevent her from expressing her opinions to MAFCO employees on the topic of how MAFCO is being run (by the plaintiffs or by anyone else). But this ban is limited by the terms that precede it, since paragraph 4 only applies to Segal's attempts to "involv[e] or engag[e] herself" in the "management or operations" of MAFCO. Based on the district court's findings, any communication by her with MAFCO's officers, directors, employees, and agents is likely to constitute her forbidden involvement or engagement in MAFCO's management or operations. It is therefore hard to see how this paragraph can be drawn more narrowly without unduly complicating its enforcement and impairing its effectiveness. We therefore uphold it.

■ (5) Segal claims that paragraph 5's ban on interfering with "the business interests of plaintiffs in MAFCO and MMAFFCL" is not "narrowly tailored." Although the plaintiffs' tortious interference claim involves only the plaintiffs' interest in MAFCO, the district court properly determined that to decide that claim, it was necessary to determine who owned MMAFFCL. The court concluded that the share acquisition agreement transferring ownership of MMAFFCL from MMAI (Segal) to PML was valid. It is therefore appropriate to enjoin Segal from asserting a continuing interest in MMAFFCL in derogation of the court's contrary ruling. We construe paragraph 5's reference to "the business interests of plaintiffs in ... MMAFFCL" to mean the plaintiffs' ownership of MMAFFCL, and therefore uphold paragraph 5.

■ (6) Segal challenges paragraph 6 as not "narrowly tailored" and as a violation of her First Amendment rights. Based on the district court's (unchallenged) legal conclusion that the plaintiffs (through MMAFFCL) have a 50% interest in MAFCO, Segal's statements to the contrary would be false and would thus constitute tortious interference. As such, the statements would be unprotected under the First Amendment. We therefore uphold paragraph 6.

■ (7) and (8) We have no problem rejecting Segal's claim that paragraphs 7 and 8 are not "narrowly tailored." Using or disclosing confidential information that Segal obtained while connected with the plaintiffs (paragraph 7) and looting MAFCO's assets (paragraph 8) clearly fit within most of the plaintiffs' claims, including breach of contract and unfair competition.

■ (9) and (11) Paragraphs 9 and 11 in essence require Segal to retract her previous statements that she has an ownership stake in MMAFFCL and MAFCO. Under conclusions of law that are unchallenged by Segal, these statements were false. These false statements constituted both unfair competition and tortious interference. There is therefore a close linkage between the retraction remedy and the specific legal violations at issue here. We reject Segal's claim that these paragraphs are not "narrowly tailored."

■ (10) Segal challenges paragraph 10 as not "narrowly tailored" and as vague, in violation of Rule 65(d). We agree with Segal that the paragraph cannot meet the Rule's command that injunctions "be specific in terms" and "describe in reasonable detail ... the act or acts sought to be restrained." There is simply no way for Segal to know what "all other reasonably needful actions" means. The phrase is undefined. Under this paragraph, Segal risks contempt if she guesses wrong about what constitutes a "reasonably needful action," or if she fails to accede to whatever demands the plaintiffs may make upon her in the future to "facilitate" the exercise of their management authority. As plaintiffs' counsel admitted at oral argument, this paragraph is nothing more than a "catch-all". The paragraph must therefore be vacated as inconsistent with Rule 65(d).

## V. SUMMARY

We affirm the district court's rulings concerning joinder and forum non conveniens. We uphold paragraphs 2, 4, 6, 7, 8, 9, and 11 of the injunction; we uphold paragraphs 3 and 5 having construed them restrictively; and we vacate paragraphs 1 and 10. On

remand, the parties will have the opportunity to address whether paragraph 1 can be successfully recast in a manner that is consistent with this opinion. The judgment of the district court is therefore affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.