**BRAVO COMPANY, Plaintiff,**

v.

**CHUM, LTD., Defendant.**

**No. 97–CV–4689 (DRH).**

United States District Court, E.D. New York.

Aug. 17, 1999.

Pennie & Edmonds, LLP, New York City, by James W. Dabney, Kelly D. Talcott, Jacqueline M. Lesser, for plaintiff.

Skadden Arps Slate Meager & Flom, LLP, New York City, by Kenneth A. Plevan, Bruce J. Goldner, Diane Kasselman, for defendant.

## MEMORANDUM and ORDER

HURLEY, District Judge.

Presently before the Court is the motion of Defendant Chum Limited ("Chum") to dismiss the action on the grounds of forum non conveniens.[1] For the reasons set forth below, the motion is denied.

## BACKGROUND

Plaintiff Bravo Company ("Bravo") is the producer and owner of a cable television service that features film and arts programming. (Compl.¶¶ 7–8.) Bravo's arts cable television programming service is identified by the trade name and service mark "BRAVO" and similar related marks. (Def.'s Mem. at 2.) Bravo alleges that it is a general partnership under New York law with its principal place of business in Woodbury, New York. (Compl.¶ 1.)

Chum principally operates radio and cable television channels in Canada. (Def.'s Mem. at 2.) It is a corporation organized under the laws of the Province of Ontario, Canada, and which has its principal place

---

1. The Court has considered the August 2, 12 and 13, 1999 correspondence of the parties in connection with the motion.

of business in Toronto, Canada. (Compl.¶ 2.)

Except as otherwise indicated, the following facts are alleged in the complaint:

*The 1993 Agreement*

On or about September 13, 1993, Bravo and Chum [2] entered into a written contract (the "1993 Agreement") in which Bravo licensed Chum to use the BRAVO mark and to supply television programming for distribution under that mark in Canada in exchange for monetary payments and royalties. (Compl.¶ 14.) The 1993 Agreement provided, *inter alia*, that "Bravo will license Chum, for use in connection with Bravo Canada, the use of all trademarks, service marks, logos, art work and other designs owned and/or used by BRAVO which include the name Bravo or any logo or design owned and/or used by BRAVO ... pursuant to a separate trademark license agreement." (*Id.* ¶ 15; 1993 Agreement ¶ 9.) Also pursuant to the 1993 Agreement, Chum was to license and deliver television programming to Bravo in New York for cablecast on the BRAVO network in the United States. (*See* 1993 Agreement ¶ 7.)

The 1993 Agreement was primarily negotiated, by Bravo, by fax and telephone from New York. (*See* Declaration of Jonathan Sehring ("Sehring Decl.") ¶ 5.) The final Agreement was signed by Bravo in New York on or about September 13, 1993. (Sehring Decl. ¶ 6.)

Bravo alleges that before the parties entered into the 1993 Agreement, as well as immediately following execution of that Agreement, Chum expressly acknowledged that Bravo was the owner of the BRAVO name and mark and the goodwill appurtenant thereto. (Compl.¶ 15.) Nevertheless, Bravo alleges, at the time Chum signed the 1993 Agreement, Chum did not intend to comply in good faith with paragraph 9 of the 1993 Agreement as Chum had secretly filed a trademark application

for registration of the name BRAVO in Canada. (*Id.* ¶ 16.) Bravo alleges that the reason Chum agreed to paragraph 9 of the 1993 Agreement was to induce Bravo "to deal with Chum under false pretenses." (*Id.*)

In or about April 1994, Bravo alleges that it discovered Chum's secret application for registration of the BRAVO mark in Canada and "immediately demanded that Chum withdraw that application." (*Id.* ¶ 17.) Chum then assured Bravo that its application "would be assigned to Bravo as part of a formal written trademark license agreement as contemplated by paragraph 9 of the 1993 Agreement." (*Id.*) Bravo alleges that these assurances were not made in good faith, were deceptive, and did in fact mislead it. (*Id.*)

On or about January 1, 1995, Chum began using the BRAVO mark to identify television programming distributed in Canada. (*Id.* ¶ 18.) On or about January 5, 1995, Bravo sent Chum a draft trademark license agreement pursuant to paragraph 9 of the 1993 Agreement. (*Id.*) As expressed in the 1993 Agreement, the license agreement specified that the license would be operable for seven years. (*Id.*)

On or about April 20, 1995, Chum advised Bravo that it wished to negotiate for a longer term than seven years. (*Id.* ¶ 19.) Bravo agreed to negotiate, but demanded that the seven year license be confirmed in the interim. (*Id.*) Chum assured Bravo that the 1993 Agreement constituted an "executed short form" trademark license that was already in effect. (*Id.*) Bravo alleges that this assurance was not made in good faith, was deceptive, and did in fact mislead it. (*Id.*)

At the same time, unbeknownst to Bravo, Chum was "taking steps designed and apparently calculated to destroy Bravo's rights in the BRAVO mark, to establish Chum as the purported owner of the mark and associated goodwill in Canada, and to

---

**2.** Bravo sought a Canadian entity to be a licensee of Bravo's cable channel arts programming on a new Canadian arts cable channel. (*See* Def.'s Mem. at 3.)

delay as long as possible Bravo's discovery of Chum's true intentions." (*Id.* ¶ 20.) Bravo further alleges that Chum (i) began to use the BRAVO mark as the name of one or more of its operating divisions without Bravo's prior authorization; (ii) began to use other marks purportedly owned by Chum in close connection with Chum's use of BRAVO in Canada, without Bravo's approval; (iii) began to "make unauthorized uses of Bravo outside of Canada and on goods which Bravo had not approved"; (iv) failed to acknowledge its license with Bravo in advertising or promotion of Bravo programming in Canada; and (v) failed to acknowledge its license with Bravo in an internet web site which Chum established without Bravo's approval. (*Id.* ¶ 21.)

In its memorandum in opposition to the motion, Bravo explains that among the actionable conduct alleged in the complaint, is Chum's improper "use of the BRAVO mark in the United States to identify itself in business dealings with third parties." (*See* Pl.'s Mem. at 7.) Specifically, with respect to one of Chum's programs, "Arts and Minds," which is frequently filmed in New York City, Bravo contends that theatrical producers and their staff in New York had been confused by Chum's use of the BRAVO mark in naming one of its operating divisions and by permitting its personnel to identify themselves as BRAVO representatives. (Berwick Decl. ¶¶ 5–7.)

Bravo further alleges in the complaint that between January 1995 and January 1997 Chum raised innumerable objections to the trademark license agreement, thereby delaying indefinitely the execution of that agreement. (*Id.*) In addition, on or about April 8, 1996, Chum secretly commenced a "trademark opposition proceeding in Canada in which Chum falsely alleged that BRAVO was its trademark and again failed to acknowledge its status as Bravo's licensee" (the "Bravo Proceeding"). (*Id.* ¶ 23.)

Bravo asserts that it did not discover the Bravo Proceeding until March 1997, at which time Bravo requested that Chum withdraw it. (*Id.*) Chum represented to Bravo that it would withdraw the Bravo Proceeding and support a parallel trademark opposition proceeding commenced by Bravo to oppose registration of the same mark. (*Id.*) In May 1997, Bravo forwarded papers to Chum for filing in the Bravo Proceeding. (*Id.* ¶ 24.) The papers acknowledged Bravo's ownership of the BRAVO mark in Canada and Chum's use of the mark under license from Bravo. (*Id.*) On June 9, 1997, Chum refused to sign the corrective documents, stating that Chum "did not want the impression to be given that the license agreement has been executed when it has not." (*Id.*) Bravo alleged that this communication was directly contrary to Chum's previous acknowledgment that the 1993 Agreement constituted an executed short form trademark license agreement between Chum and Bravo and constituted a breach of the 1993 Agreement. (*Id.*)

Thereafter, Bravo discovered that Chum had secretly applied for trademark registration of the BRAVADO and BRAVISSIMO marks, in breach of the 1993 Agreement. (*Id.* ¶ 26.) Bravo thereafter demanded that Chum execute a formal written trademark license agreement covering the initial seven-year term of the September 1993 Agreement, assign to it Chum's application for registration of the Bravo mark and withdraw its applications for registration of the BRAVADO and BRAVISSIMO marks. (*Id.*) Chum failed to do so. (*Id.*)

Bravo's first claim is for breach of the 1993 Agreement, including the covenant of good faith and fair dealing contained therein. (*Id.* ¶ 30.)

*The 1995 Agreement*

Bravo's second claim alleges that Chum anticipatorily breached a second agreement (the "1995 Agreement") to an extension of Chum's license to use the BRAVO mark after the initial seven-year term at specified royalty rates (the "1995 Agree-

ment"). (*Id.* ¶ 32.) The material terms of that alleged 1995 Agreement were reached at a meeting in Woodbury, New York on or about September 13, 1995, attended by three Chum representatives and representatives of Bravo. (*See, e.g.,* Declaration of Kenneth H. Goorin ("Goorin Decl.") ¶ 6; Declaration of Joshua W. Sapan ("Sapan Decl.") ¶¶ 4–5; Declaration of Kathleen Dore ("Dore Decl.") ¶ 14.)

Bravo alleges that a summary of the material terms of the 1995 Agreement was sent to Chum and, by letter dated November 17, 1995, Chum indicated its acceptance of those terms. (Compl. ¶ 33.) In its opposition to the motion, Bravo further asserts that the terms of the alleged 1995 Agreement were summarized in a number of letters sent to or from New York, dated September 15, November 17, December 4, 7, 11, and 19, 1995. (Goorin Decl. ¶ 6.)

Bravo further alleges that on or about March 11, 1997, Chum allegedly "repudiated a key term of the 1995 Agreement and asserted that its license to use BRAVO was or should be terminable by Chum at any time upon the giving of sixty (60) days notice by Chum." (Compl. ¶ 34.)

*Relief Sought in the Complaint*

Bravo asserts claims for: violation of New York General Business Law section 349; "passing off under New York, Canadian, and other applicable law"; trademark infringement under 15 U.S.C. § 1114(1); false designation of origin under section 43(a) of the Lanham Act; unjust enrichment under New York law; unfair competition under New York law; and "dilution" under 15 U.S.C. § 1117(c) and New York General Business Law section 368–d. (*See* Compl. ¶¶ 12–14.)

## DISCUSSION

 "There is ordinarily a strong presumption in favor of the plaintiff's choice of forum." *Murray v. British Broadcasting Corp.,* 81 F.3d 287, 290 (2d Cir.1996). As a general matter, "the plaintiff's choice of forum should rarely be disturbed."

*Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). This presumption "is fortified where an American plaintiff brings suit against a foreign entity and the alternative forum is foreign." *David Tunick, Inc. v. Kornfeld,* 813 F.Supp. 988, 992 (S.D.N.Y.1993); *see also Olympic Corp. v. Societe Generale,* 462 F.2d 376, 378 (2d Cir.1972) ("In any situation, the balance must be very strongly in favor of the defendant, before the plaintiff's choice of forum should be disturbed, ... and the balance must be even stronger when the plaintiff is an American citizen and the alternative forum is a foreign one."). Nevertheless, in certain situations, "[t]he doctrine of forum non conveniens permits a court to 'resist imposition upon its jurisdiction even when *jurisdiction* is authorized by the letter of a general venue statute.'" *Murray,* 81 F.3d at 289 (quoting *Gulf Oil,* 330 U.S. at 508–09, 67 S.Ct. 839). As the Supreme Court has explained:

> Where there are only two parties to a dispute, there is good reason why it should be tried in the plaintiff's home forum if that has been his choice. He should not be deprived of the presumed advantages of his home jurisdiction except upon a clear showing of facts which either (1) establish *such oppressiveness and vexation to a defendant as to be out of all proportion to plaintiff's convenience,* which may be shown to be slight or nonexistent, or (2) *make trial in the chosen forum inappropriate because of considerations affecting the court's own administrative and legal problems.* In any balancing of conveniences, a real showing of convenience by a plaintiff who has sued in his home forum will normally outweigh the inconvenience the defendant may have shown.

*Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947) (emphases added); *see American Dredging Co. v. Miller,* 510 U.S. 443, 447–48, 114 S.Ct. 981, 127 L.Ed.2d 285 (1994) (forum non conveniens determina-

tion requires proof of "oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience" or proof that the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems" (citations and internal quotation marks omitted)). Indeed, courts require "proof of unusually extreme circumstances demonstrating that material injustice is manifest [in order] to justify overturning plaintiff's choice in favor of a foreign [non-U.S.] forum." *Marsin Med. Int'l, Inc. v. Bauhinia Ltd.*, 948 F.Supp. 180, 190 (E.D.N.Y.1996) (citations and internal quotation marks omitted); *see Leasco Data Processing Equip. Corp. v. Maxwell*, 468 F.2d 1326, 1344 (2d Cir.1972).

In deciding whether to dismiss an action under the doctrine of forum non conveniens, a district court first must determine whether there is an alternate forum with jurisdiction to hear the case. *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 46 (2d Cir.1996). Where such an alternate forum exists, the court must weigh the considerations set forth in *Gilbert* to determine which "forum ... will be the most convenient and will best serve the ends of justice." *Peregrine*, 89 F.3d at 46.

■ The Supreme Court, in *Gilbert*, identified the following private interests: (i) the parties' relative ease of access to sources of proof; (ii) the availability of compulsory process for unwilling witnesses; (iii) the cost of obtaining the attendance of willing witnesses; (iv) the possibility of view of premises, (v) enforceability of a possible judgment; and (vi) other practical problems that could make the trial protracted, difficult, and costly. 330 U.S. at 508–09, 67 S.Ct. 839. The public interest factors identified in *Gilbert* include: (i) administrative difficulties resulting from court congestion in the district; (ii) the imposition of jury duty on a district having no relation to the litigation; (iii) the court's interest in having local disputes decided locally; and (iv) the fa-

miliarity of the trial court with the applicable law. *Id.*

■ In evaluating the foregoing factors, the court may consider affidavits of the moving and opposing parties. *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 645 (2d Cir.1956).

With respect to the threshold inquiry set forth in *Gilbert*, there is no dispute that Canada is an alternate forum with jurisdiction to hear to the present disputes. (*See* Pl.'s Mem. at 15 n. 3.) Consequently, the Court turns to the private and public factors that must be considered.

### A. Parties' Relative Ease Of Access To Sources Of Proof

Chum asserts that "[b]ecause Bravo's claims center on Chum's activities in Canada, key relevant witnesses and documents obviously are located in Canada." (Def.'s Mem. at 19.) While there does not appear to be any dispute that many, if not most, of Chum's witnesses live and work in Canada, conversely, most of Bravo's witnesses are located in Woodbury, New York. (*See* Motion Ex. 3 at 1.)

Similarly, the initial disclosures reveal that the parties' respective documentary evidence is maintained, in large part, by Bravo and Chum in New York and Canada, respectively. Chum cannot make a serious argument that sources of documentary evidence are inaccessible to it now or that they would be at trial, or that access to such evidence poses any serious difficulties.

### B. Availability Of Compulsory Process For Unwilling Witnesses

Defendant argues that "third-party witnesses will not be subject to subpoena to testify at trial if the lawsuit proceeds in the United States." (Def.'s Mem. at 19.) Defendant does not identify any specific witnesses it believes will be unwilling to testify, but suggests that the possibility that certain witnesses, including the Toronto Dominion Bank (the "TDM"), which

"acted as an agent for Bravo," other Canadian companies which Bravo and the TDM approached as candidates for a license with the Canadian Radio-television and Telecommunications Commission (the "CRTC"), and a representative of the CRTC, (see Def.'s Mem. at 19), may be unwilling to attend trial should defendant wish to call them as witnesses.

As an initial matter, Chum has not shown that deposition procedures are unavailable to examine any such witnesses. See, e.g.,Flynn v. General Motors, 141 F.R.D. 5, 10 (E.D.N.Y.1992). Moreover, assuming arguendo, that certain witnesses did express unwillingness to testify at trial, as Bravo points out, any such problems concerning discovery may well be addressed by the issuance of letters rogatory. Cf. R. Maganlal v. M.G. Chem. Co., 942 F.2d 164, 169 (2d Cir.1991) ("[A]ny testimony MG needs from witnesses whose attendance cannot be compelled can be obtained, for example, through the use of letters rogatory."); Overseas Programming Cos. v. Cinematographische Commerz–Anstalt, 684 F.2d 232, 235 (2d Cir. 1982) ("[A]ny difficulties that the Court might encounter regarding witnesses whose attendance the Court is unable to compel can most likely be resolved by the use of deposition testimony or letters rogatory."). In any event, as Bravo has pointed out, Chum's "references to Canadian broadcasting regulations and the CRTC's approval, in 1994, of a license permitting Chum to offer a film and arts programming service in Canada, are at most background to the dispute before the Court." (Dore Decl. ¶ 21.) Chum has failed to argue how these third-party witnesses are critical to this case, and it does not appear to the Court on this record that they would provide more than background information to the present disputes.

### C. Cost of Obtaining the Attendance of Willing Witnesses

Bravo has represented that the vast majority of its witnesses reside and work in the United States. (See Pl.'s Mem. at 8; Pl.'s Initial Disclosures at 1.) Chum, however, has indicated that its witnesses are located in Canada. (See Def.'s Mem. at 19.)

It appears that "[w]herever the trial takes place, witnesses will be forced to travel to provide testimony," Peregrine, 89 F.3d at 46–47 (internal quotation marks omitted), and Chum has not asserted that the cost of obtaining the attendance of its willing witnesses would be more than the cost to Bravo to transport its witnesses to Canada or that the cost to Chum to transport its witnesses would be prohibitive. Accordingly, Chum has not established that this factor weighs in favor of dismissal.

### D. Possibility of View of Premises

Chum did not argue in its memorandum of law that there are any "premises" such that this factor should be considered in this case. (See Pl.'s Mem. at 17.) Only in its Reply Brief did Chum even attempt to imply that this factor has some applicability. (Def.'s Reply Mem. at 8.) Chum states:

[G]iven that Bravo's claims center on alleged (i) misuse of trademarks in Canada and alleged misappropriation of goodwill there, and (ii) damages resulting therefrom, it is obvious that evidence regarding these issues is more readily available in Canada, including for example, consumer survey evidence regarding Bravo's allegations of misappropriation of goodwill by Chum.

(Id.)

Not only does Chum fail to cite any authority to suggest that this type of evidence constitutes "premises," the Court also does not find it "obvious" that evidence regarding these issues is "more readily available" in Canada. (Id.) Aside from "consumer survey evidence."—which easily could be transmitted to New York— Defendant fails to address the specific evidence that would bear on these issues and,

in any event, it appears likely that evidence concerning these claims would also be documentary evidence, which easily could be brought before this Court at trial.

### E. *Enforceability of a Possible Judgment*

Chum, citing *Vanity Fair Mills v. T. Eaton Co.*, 234 F.2d 633, 642–43 (2d Cir. 1956), notes in its memorandum of law in support of the motion that "Bravo asks [the Court] to determine the permissible use and registration of certain trademarks in Canada," and argues, without significant elaboration, that "[t]he difficulties in enforcing a United States judgment on a foreign sovereign" favor dismissal here. (Def.'s Mem. at 20.)

In *Vanity Fair*, plaintiff Vanity Fair Mills, a Pennsylvania corporation, had offered its "Vanity Fair" brand of women's underwear for sale in the United States and Canada since 1917. 234 F.2d at 637. In 1914, plaintiff protected its "Vanity Fair" trademark in the United States by registration with the United States Patent Office. *Id.* As a result of the quality of plaintiff's merchandise as well as plaintiff's sale promotion and advertising of its product, the "Vanity Fair" name became associated throughout the United States and Canada with plaintiff's products. *Id.* Defendant The Eaton Company, Ltd., a Canadian corporation, in 1915 filed with the proper Canadian official an application for the registration of the trademark "Vanity Fair" in Canada claiming use in connection with the sale of various wearing apparel. *Id.* Such registration was accepted. *Id.* In 1919, plaintiff sought to register the trademark "Vanity Fair" in Canada for "ready-made underwear," but such application was rejected because of defendant's prior registration. *Id.* at 638.

From 1945 until 1953, defendant stopped using its "Vanity Fair" trademark, purchased merchandise from plaintiff, and sold this merchandise under advertisements indicating that the merchandise was manufactured by plaintiff. *Id.* In 1953, defendant resumed use of its "Vanity Fair" trademark and, at the same time and under the same trademark, sold plaintiff's merchandise and cheaper merchandise of another manufacturer. *Id.* Defendant then also objected to plaintiff selling its branded merchandise to one of defendant's Canadian competitors and threatened that competitor with infringement litigation. *Id.* The competitor discontinued purchases of plaintiff's product as a result.

Plaintiff commenced suit against defendant, alleging that defendant's acts constituted conspiracy to appropriate for their own benefit plaintiff's registered and common law trademark. *Id.* Plaintiff alleged that this appropriation of its mark operated as follows. First, defendant purchased plaintiff's products for years and advertised and sold the goods as plaintiff's. *Id.* Then defendant used its "Vanity Fair" trademark in connection with its own inferior women's underwear, discontinued purchases from plaintiff and threatened its competitors with infringement suits if they continued to purchase plaintiff's merchandise. *Id.*

Plaintiff also alleged in the action that defendants advertised its women's underwear in the United States under the trademark "Vanity Fair." *Id.*

The complaint sought injunctive relief against the use by defendant of the trademark "Vanity Fair" in connection with the sale of women's underwear both in Canada and the United States as well as a declaration that plaintiff had superior rights in the trademark and an accounting of damages. *Id.*

The United States District Court for the Southern District of New York (Dawson, J.) dismissed the action on the ground of forum non conveniens, and plaintiff appealed.

On appeal, the Second Circuit in *Vanity Fair* noted that the "crucial issue" was "the validity of defendant's Canadian trade-mark registration under Canadian trade-mark law," *id.* at 646, and held that

the district court had not abused its discretion in declining to exercise jurisdiction over that portion of the case arising in Canada and governed by Canadian trademark law. *Id.* at 644. The court explained:

> [W]e do not think it the province of United States district courts to determine the validity of trade-marks which officials of foreign countries have seen fit to grant. To do so would be to welcome conflicts with the administrative and judicial officers of the Dominion of Canada. We realize that a court of equity having personal jurisdiction over a party has power to enjoin him from committing acts elsewhere. But this power should be exercised with great reluctance when it will be difficult to secure compliance with any resulting decree or when the exercise of such power is fraught with possibilities of discord and conflict with the authorities of another country.

> The district court, therefore, did not abuse its discretion in refusing to entertain the claims of trade-mark infringement and unfair competition occurring in Canada. Were it not for the fact that plaintiff did not press its American claims, and they appear to be of somewhat minor significance, we would think it improper to dismiss the entire complaint, since we think that the claims of trade-mark infringement and unfair competition occurring in the United States can be clearly ascertained from the complaint.

*Id.* at 647.

In its opposition to the motion, Bravo notes that the instant case is distinguishable from *Vanity Fair* in that the thrust of the complaint in this action is for breach of contract. (Pl.'s Mem. at 17–18.) With respect to Chum's concerns that the Court's decision will conflict with the au-

thority of Canadian trademark authorities, as Bravo points out, Chum has conceded that Bravo is the owner of the BRAVO mark in Canada, and that "Chum has no ownership interest in any goodwill appurtenant to the BRAVO mark," (Def.'s Response to Pl.'s First Request For Admissions at ¶¶ 1, 6 (annexed to Second Declaration of James W. Dabney, at Ex. 3)), and on June 8, 1999, Chum assigned to Bravo the application for registration of the BRAVO mark. (*See* Aug. 2, 1999 letter of James W. Dabney.) Moreover, Chum cancelled its registration of the BRAVISSIMO mark on January 5, 1999 and, in June 1998, abandoned its registration of the BRAVADO mark. (*See* Aug. 2, 1999 letter, Exs. 1 and 3.) Accordingly, there does not appear to be any application before the Canadian trademark authorities with which the judgment of this Court could conflict. Moreover, as the action does not implicate Chum's rights to such marks under Canadian trademark law but rather seeks to determine Chum's rights to such marks under the contract between the parties, the judgment of this Court would not conflict with the judgment of Canadian trademark authorities in any event.

Accordingly, this factor does not weigh in favor of dismissal.

*Public Interest Factors*

 The public interest factors do not militate that the case be dismissed. The 1993 and 1995 Agreements were negotiated significantly by the parties, and executed by Bravo, in New York, and this case was commenced here by Bravo, a New York corporation,[3] to seek redress for, *inter alia,* alleged breaches of those agreements. Moreover, notwithstanding Chum's repeated assertions that "this entire controversy centers around the alleged misuse of licensed trademarks in Canada," (Def.'s Mem. at 10), it is clear

---

**3.** While the Court acknowledges that a Plaintiff's residence and citizenship may not be given a "talismanic" significance, "neither are they to be completely stripped of their

significance." *Flynn,* 141 F.R.D. at 8 (internal citations omitted). Bravo's citizenship in New York alone would not have been sufficient to justify denial of Chum's motion.

from the face of the complaint that not all the conduct complained of occurred in Canada, (*see* Compl ¶ 21), and some of the conduct complained of occurred in the United States (*see* Berwick Decl. ¶¶ 5–7). Accordingly, while there does not appear to be any dispute that Canada would have an interest in this case, this community similarly has an interest. *See, e.g., Boosey & Hawkes v. Walt Disney Co.*, 145 F.3d 481, 492 (2d Cir.1998) (considering, *inter alia*, situs of negotiation of contract in considering forum non conveniens motion); *Flynn*, 141 F.R.D. at 10 (" '[T]he community served by this court has a clear interest in providing a forum in which one of its citizens may seek to redress a wrong.' ") (quoting *Fiacco v. United Tech. Corp.*, 524 F.Supp. 858, 861 (S.D.N.Y.1981)). "Because both jurisdictions have some interest in this dispute, the concern with burdening jurors is not present." *Capital Currency Exch., N.V. v. National Westminster Bank PLC*, 155 F.3d 603, 611 (2d Cir.1998).

While there can be no question that the Court labors under a heavy docket, discovery is almost complete[4] and there is no basis to suggest that the Canadian courts are more or less congested than this Court or that trial would be any easier, more expeditious, or less expensive were it to take place in Canada. *See, e.g., id.* Indeed, in light of the status of discovery, a trial will likely begin sooner here than elsewhere.

With respect to the final public interest factor, *i.e.*, familiarity of the trial court with the applicable law, Chum argues that Bravo's claims must be decided under Canadian law and that this factor weighs in

favor of dismissal.[5] (*See* Def.'s Mem. at 18.) As an initial matter, the Court notes that most of Bravo's claims are alleged under New York law. (*See* Compl. ¶¶ 3, 38, 42, 45, 46, 48, 50, 52.) Even assuming, *arguendo*, that Canadian law should be applied in this case, "the fact that the law of the foreign forum differs from American law 'should ordinarily not be given conclusive or even substantial weight,' in assessing the adequacy of the forum." *Capital Currency*, 155 F.3d at 609 (citation omitted); *see also R. Maganlal & Co.*, 942 F.2d at 169 (2d Cir.1991) ("[T]he need to apply foreign law is not alone sufficient to dismiss under the doctrine of forum non conveniens."). In any event, "[t]he task of deciding foreign law is a chore that the federal courts are called upon to perform with regularity." *Ciprari v. Servicos Aereos Cruzeiro do Sul, S.A.*, 232 F.Supp. 433, 443 (S.D.N.Y.1964).[6]

The Court, having weighed the factors set forth in *Gilbert*, concludes that dismissal based on the doctrine of forum non conveniens is not warranted.

## CONCLUSION

For the reasons set forth above, the motion is denied.

SO ORDERED.

---

**4.** Discovery had been closed but, by Order dated July 23, 1999, was reopened until October 29, 1999. (*See* July 23, 1999 Order (Boyle, M.J.) ("There will be no further extensions of this discovery.").)

**5.** Chum explains that dismissal is particularly appropriate because Bravo alleges in the Complaint that "the action 'arises under,' *inter alia*, 'the common and statutory laws of the Dominion of Canada.' " (Def.'s Mem. at 10 (citing Compl. ¶ 3).) The complete perti-

nent portion of the complaint states: "[t]his action arises under the Trademark Act, 15 U.S.C. §§ 1051 *et seq.*, the General Business Law, N.Y.Gen.Bus.Law § 349, the common law of the State of New York, and the common and statutory laws of the Dominion of Canada." (Compl.¶ 3.)

**6.** There is no assertion by Chum that the relevant law of Canada in any way differs from the relevant law of the United States.