155 F.3d 603
 1998-2 Trade Cases P 72,281
 CAPITAL CURRENCY EXCHANGE, N.V., doing business as
Chequepoint USA and Chequepoint Worldcash, Inc.,
Plaintiffs-Appellants,
v.
NATIONAL WESTMINSTER BANK PLC, Barclays Bank Plc, Hamish
Martin Vincent Gray, Lord Alexander Of Weedon And
John Martin Taylor, Defendants-Appellees.
 Docket No. 97-9228.
 United States Court of Appeals,
Second Circuit.
 Argued April 1, 1998.
Decided Sept. 16, 1998.
 
 Jeffrey I. Zuckerman, Curtis, Mallet-Prevost, Colt & Mosle, Washington, DC, for Appellants.
 Thomas P. Ogden, Davis Polk & Wardwell, New York City, (John J. Clarke, Jr., Barbara D. Diggs, of counsel), for Appellees National Westminster Bank PLC, Hamish Martin Vincent Gray and Lord Alexander of Weedon.
 Philip L. Graham, Jr., Sullivan & Cromwell, New York City, (John W. Dickey, Michael B. Miller, Stephanie G. Wheeler, of counsel), for Appellees Barclays Bank PLC and John Martin Taylor.
 Before: McLAUGHLIN and PARKER, Circuit Judges, and EGINTON, District Judge.*
 McLAUGHLIN, Circuit Judge:
 
 BACKGROUND
 
 1
 Capital Currency Exchange, N.V. ("CCE"), is a financial company organized under the laws of the Netherlands Antilles. CCE has a number of affiliates, including Chequepoint Worldcash, Inc. ("Worldcash"), a New York corporation, and Chequepoint (UK) Ltd. ("Chequepoint UK"), a British Virgin Islands company that transacts business in Great Britain.
 
 
 2
 CCE and its affiliates are engaged principally in two kinds of international financial transactions: (1) retail currency exchange, e.g., changing pounds to dollars for tourists; and (2) money transfers, e.g., wiring money from the United States to England.
 
 
 3
 Barclays Bank PLC ("Barclays UK") and National Westminster Bank PLC ("NatWest UK") are English corporations. As full-service banks, Barclays UK and NatWest UK offer currency exchange and money transfer services to their customers.
 
 
 4
 CCE and its affiliates had a longstanding banking relationship with Barclays UK. In 1991, CCE, on behalf of Worldcash, sought a New York State money transmission license. To qualify for this license, Worldcash had to post a $500,000 bond in favor of the New York State banking authorities. CCE arranged with Barclays UK's New York office to issue an irrevocable letter of credit as security for the bond. This letter of credit was payable in New York and expressly was governed by New York law. The letter of credit, however, named Barclays UK's London office as the issuer.
 
 
 5
 In May 1995, for reasons that the parties hotly dispute, Barclays UK told CCE to find another banker. Barclays UK claims that it discovered Chequepoint UK's complicity in a check kiting scheme, and decided to end its relationship with CCE and its affiliates. CCE counters that Barclays UK wanted to use a trademark that was similar to one owned by CCE, and when CCE objected, Barclays UK set out to end their relationship.
 
 
 6
 Whatever the reason, CCE began negotiating with NatWest UK in July 1995 to establish a new banking relationship. In August 1995, NatWest UK declined to provide CCE with banking services. The reasons for NatWest UK's refusal are disputed. At the time, NatWest UK attributed its refusal to the fact that: (1) NatWest UK and Chequepoint UK were competitors in the money transfer business; and (2) Chequepoint UK had misrepresented facts about NatWest UK's money transfer services to consumers. NatWest UK now claims that its refusal was based on information that led it to believe that CCE and Chequepoint UK were involved in money laundering. CCE maintains that NatWest UK and Barclays UK conspired to drive CCE out of the money transfer business by depriving it of banking services.
 
 
 7
 On August 23, 1996, CCE and Worldcash, but not Chequepoint UK, brought suit in the United States District Court for the Southern District of New York (Stanton, J.). The suit named as defendants: (1) NatWest UK; (2) Hamish Gray, the CEO of NatWest UK; (3) Lord Alexander of Weedon, the Chairman of NatWest UK's Board of Directors; (4) Barclays UK; and (5) John Martin Taylor, the CEO of Barclays UK. The complaint alleged that NatWest UK, Barclays UK, and the individual defendants violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, by denying banking services to CCE and its affiliates. The complaint also alleged four common law causes of action against Barclays UK and Taylor arising out of the termination of the CCE-Barclays UK banking relationship.
 
 
 8
 On November 6, 1996, defendants moved to dismiss the complaint: (1) for failure to state a claim; and (2) under the forum non conveniens doctrine. On August 28, 1997, Judge Stanton granted defendants' motion solely on forum non conveniens grounds. Judge Stanton found that: (1) antitrust suits are subject to the forum non conveniens doctrine; (2) England is an adequate forum for plaintiffs' suit; and (3) the public and private interests involved in this suit favor litigation in England.
 
 
 9
 CCE and Worldcash now appeal, arguing that all three of Judge Stanton's conclusions were erroneous.
 
 DISCUSSION
 
 10
 I. Application of Forum Non Conveniens to Antitrust Suits
 
 
 11
 CCE and Worldcash posit that an antitrust suit cannot be dismissed under the forum non conveniens doctrine. We disagree.
 
 
 12
 Judge Stanton's conclusion that an antitrust suit can be dismissed under the forum non conveniens doctrine is a conclusion of law that we review de novo. See Murray v. British Broad. Corp., 81 F.3d 287, 292 (2d Cir.1996).
 
 
 13
 The common law has long permitted dismissal of suits where jurisdiction and venue are proper, but another forum is substantially more convenient. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 248 n. 13, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); Canada Malting Co. v. Paterson S.S., 285 U.S. 413, 52 S.Ct. 413, 76 L.Ed. 837 (1932); Blair, The Doctrine of Forum Non Conveniens in Anglo-American Law, 29 Colum. L.Rev. 1 (1929). Despite the doctrine's long history, the Supreme Court did not explicitly recognize the applicability of forum non conveniens in federal question cases until 1947. See Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Even after Gilbert, however, the doctrine did not apply in cases brought under certain federal statutes. See, e.g., Baltimore & Ohio R.R. Co. v. Kepner, 314 U.S. 44, 62 S.Ct. 6, 86 L.Ed. 28 (1941) (Federal Employers Liability Act suits not subject to dismissal in favor of more convenient forum), overruled by Ex parte Collett, 337 U.S. 55, 69 S.Ct. 944, 93 L.Ed. 1207 (1949).
 
 
 14
 In United States v. National City Lines, 334 U.S. 573, 596, 68 S.Ct. 1169, 92 L.Ed. 1584 (1948) ("National City I "), the Supreme Court held that forum non conveniens could not be used to transfer an antitrust suit to a more convenient forum within the United States. In National City I, the government sued a number of corporations under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2, alleging that the defendants conspired to monopolize public transportation in a number of cities. The government brought the suit in Los Angeles, in what was then the Southern District of California.
 
 
 15
 Defendants moved to dismiss on the ground that the Northern District of Illinois was a more convenient forum. The district court granted defendants' motion and dismissed the complaint without prejudice to re-filing in the Northern District of Illinois. See United States v. National City Lines, 7 F.R.D. 456, 466 (S.D.Cal.1947).
 
 
 16
 On direct appeal pursuant to 15 U.S.C. § 29, the Supreme Court reversed, holding that forum non conveniens could not be used to dismiss a suit brought under the Sherman Act. See National City I, 334 U.S. at 578, 68 S.Ct. 1169. The Court's conclusion was based on the "special venue" provision in Section 12 of the Clayton Act, which liberalized the venue provisions of the Sherman Act. See 15 U.S.C. § 22 (Clayton Act); 15 U.S.C. §§ 5, 7 (Sherman Act). Section 12 of the Clayton Act permits a Sherman Act claim to be brought "in any district wherein [a defendant corporation] may be found or transacts business." 15 U.S.C. § 22; see Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 372-73, 47 S.Ct. 400, 71 L.Ed. 684 (1927).
 
 
 17
 The National City I Court reasoned that: (1) Section 12 of the Clayton Act demonstrated a congressional intent to expand the possible fora available to antitrust plaintiffs; and (2) application of forum non conveniens in Sherman Act cases would be inconsistent with that intent. "To have broadened the choice of venue for the reasons that brought about that action [namely, to prevent wealthy corporate defendants from transferring suits to distant and expensive venues], only to have it narrowed again by application of the vague and discretionary power comprehended by forum non conveniens would have been incongruous, to say the least." National City I, 334 U.S. at 581, 68 S.Ct. 1169.
 
 
 18
 In September 1948, shortly after National City I was decided, Congress enacted 28 U.S.C. § 1404(a), which provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." Section 1404(a) thus supplanted the common law doctrine of forum non conveniens for transfers between United States district courts. See Fitzgerald v. Westland Marine Corp., 369 F.2d 499, 501 n. 3 (2d Cir.1966). Section 1404(a) does not apply in cases where the purportedly more convenient forum is not a United States district court. In such cases, almost always involving foreign countries, the common law doctrine of forum non conveniens still governs. See Piper, 454 U.S. at 253, 102 S.Ct. 252; Fitzgerald, 369 F.2d at 501 n. 3. Section 1404(a) cases are transferred to a more convenient federal forum; forum non conveniens cases are dismissed in anticipation of re-filing in a more convenient foreign forum. See 15 Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3828, at 278-79 (1986).
 
 
 19
 After § 1404(a) was enacted, the National City I defendants again moved to transfer the case to the Northern District of Illinois, this time relying on the new statute. The district court granted the motion. See United States v. National City Lines, 80 F.Supp. 734, 744 (S.D.Cal.1948). The government moved for leave to file a petition for certiorari, but the Supreme Court denied the motion, holding that § 1404(a) had overruled National City I, and the district court therefore was free to transfer the case. See United States v. National City Lines, 337 U.S. 78, 84, 69 S.Ct. 955, 93 L.Ed. 1226 (1949) ("National City II ").
 
 
 20
 The National City II Court explained that § 1404(a) authorized the transfer of "any civil action" between federal district courts, including antitrust cases. See id. at 80, 69 S.Ct. 955 (quoting 28 U.S.C. § 1404(a)). Although its decision was based upon § 1404(a), the Court did not explicitly limit its holding to cases governed by § 1404(a). Indeed, the National City II Court did not distinguish § 1404(a) from the common law doctrine of forum non conveniens, noting that the issue before it was whether § 1404(a) "extends the doctrine of forum non conveniens to antitrust suits." See id. at 79, 69 S.Ct. 955; see also id. at 80, 69 S.Ct. 955 (noting that Federal Employers Liability Act cases were "now subject to the doctrine of forum non conveniens" as a result of § 1404(a)) (citing Ex Parte Collett, 337 U.S. at 55, 69 S.Ct. 944, and Kilpatrick v. Texas & Pac. R.R. Co., 337 U.S. 75, 69 S.Ct. 953, 93 L.Ed. 1223 (1949)). Thus, although its reasoning relied on § 1404(a), National City II left open the possibility that an antitrust case could be dismissed under the forum non conveniens doctrine, even if § 1404(a) did not apply.
 
 
 21
 CCE and Worldcash seek to draw a distinction that National City II failed to make between cases governed by § 1404(a) and those governed by the common law doctrine of forum non conveniens. They argue that because National City II was based upon § 1404(a), it overruled National City I only with regard to cases governed by § 1404(a). They then conclude that because § 1404(a) does not apply in this case, forum non conveniens dismissal is precluded by the holding of National City I. We do not agree.
 
 
 22
 As an initial matter, plaintiffs ignore Transunion Corp. v. PepsiCo, Inc., 811 F.2d 127, 130 (2d Cir.1987) (per curiam), where we explained that the holding in National City I is no longer valid, even in cases that are not governed by § 1404(a). In Transunion, defendants sought dismissal of a RICO claim on the ground that the Philippines was a more convenient forum. We affirmed Judge Weinfeld's grant of dismissal, holding that forum non conveniens can apply to RICO claims, despite the fact that the RICO statute has a "special venue" provision modeled on Section 12 of the Clayton Act. See id.
 
 
 23
 In Transunion, we specifically rejected the argument that National City I foreclosed the availability of forum non conveniens when a statute has a "special venue" provision like Section 12 of the Clayton Act. Even though Transunion was not governed by § 1404(a), we concluded that "the result in National City [I] was effectively overruled by Congress in 1948 when it enacted 28 U.S.C. § 1404(a)," and affirmed dismissal. Id. Thus, in this Circuit, National City I is no longer good law, even in cases that are not governed by § 1404(a). See id.; see also Cruz v. Maritime Co., 702 F.2d 47, 48 (2d Cir.1983) (per curiam) (forum non conveniens applicable in cases governed by Jones Act despite special venue provision).
 
 
 24
 The plaintiffs characterize our conclusion in Transunion regarding National City I as mere dictum, and maintain that it therefore is not binding upon this panel. We disagree.
 
 
 25
 Plaintiffs in Transunion argued that National City I 's bar on forum non conveniens dismissals applied to RICO claims because the RICO statute's venue provision was "modeled on present antitrust legislation," H.R.Rep. No. 1549, 91st Cong., 2d Sess. 58 (1970), U.S. Code Cong. & Admin. News at 4007; see Transunion, 811 F.2d at 130. We rejected this argument on the ground that antitrust legislation in 1970 did not incorporate the holding of National City I because "the result in National City Lines [I] was effectively overruled by Congress in 1948 when it enacted [§ 1404(a) ]." Id. This statement was hardly dictum. It was necessary to our conclusion that National City I 's holding did not apply in RICO cases. See Seminole Tribe v. Florida, 517 U.S. 44, 67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996) ("[w]hen an opinion issues for the Court, it is not only the result but also those portions of the opinion necessary to the result by which we are bound."); see also Commodity Futures Trading Comm'n v. Dunn, 58 F.3d 50, 53-54 (2d Cir.1995), rev'd on other grounds, 519 U.S. 465, 117 S.Ct. 913, 137 L.Ed.2d 93 (1997).
 
 
 26
 The First Circuit reached the same conclusion on the validity of National City I, although it employed somewhat different reasoning. In Howe v. Goldcorp Inv., Ltd., 946 F.2d 944, 949 (1st Cir.1991), then-Chief Judge Breyer explained that National City I did not preclude forum non conveniens dismissal of a case not governed by § 1404(a), even when the cause of action is based upon a statute with a "special venue" provision modeled on Section 12 of the Clayton Act. Justice Breyer specifically rejected the argument that the holding in National City I continues to govern forum non conveniens dismissals. His analysis was based upon the facts of National City I and a strict construction of the holding in that case.
 
 
 27
 As discussed above, National City I involved a transfer between two United States district courts. Justice Breyer pointed out that "the Court in National City Lines I considered only domestic transfers; it did not consider international transfers at all." See id. Because National City I did not consider international transfers, Justice Breyer reasoned, the holding could not have applied to such cases. Justice Breyer therefore concluded that the holding of National City I did not preclude the use of forum non conveniens in the international context, and the question whether National City II overruled National City I was irrelevant. See id.
 
 
 28
 We concede that the Fifth Circuit has essentially accepted the argument advanced by CCE and Worldcash. See Kempe v. Ocean Drilling & Exploration Co., 876 F.2d 1138, 1144 (5th Cir.1989); Industrial Inv. Dev. Corp. v. Mitsui & Co., Ltd., 671 F.2d 876, 890 (5th Cir.1982). In Mitsui, the court found that National City II overruled National City I only with regard to transfers between United States district courts. This conclusion was based upon the fact that National City II specifically relied on § 1404(a) in finding that National City I was invalid. See Mitsui, 671 F.2d at 890.
 
 
 29
 For the reasons discussed above, we are not persuaded by the Fifth Circuit's reasoning. In the first place, as Justice Breyer explained, National City I 's holding was limited to domestic transfers. See Howe, 946 F.2d at 949. Moreover, National City II and its companion cases did not draw a bright-line distinction between transfers under § 1404(a) and the doctrine of forum non conveniens. See National City II, 337 U.S. at 79, 80, 69 S.Ct. 955; see also Ex Parte Collett, 337 U.S. at 56, 69 S.Ct. 944. Finally, Mitsui directly conflicts with our conclusion in Transunion, which we are bound to follow. We conclude, therefore, that antitrust suits are subject to dismissal under the forum non conveniens doctrine.
 
 
 30
 II. Application of Forum Non Conveniens to this Suit
 
 A. Governing Law
 
 31
 Plaintiffs argue that, even if an antitrust case can be dismissed on forum non conveniens grounds, Judge Stanton erred by concluding that the doctrine supported dismissal in this case. We disagree.
 
 
 32
 Our review of a forum non conveniens dismissal is extremely limited. See Piper, 454 U.S. at 257, 102 S.Ct. 252. "[T]he decision lies wholly within the broad discretion of the district court and should be reversed only if that discretion has been clearly abused." Peregrine Myanmar Ltd. v. Segal, 89 F.3d 41, 46 (2d Cir.1996) (internal quotation marks and citation omitted); see also Boosey & Hawkes Music Publishers, Ltd. v. The Walt Disney Co., 145 F.3d 481, 491 (2d Cir.1998) (limited but "meaningful" review).
 
 
 33
 Any forum non conveniens analysis involves two steps. First, a court must determine that an adequate alternative forum exists. See Piper, 454 U.S. at 254, 102 S.Ct. 252; Peregrine Myanmar, 89 F.3d at 46. An alternative forum is adequate if: (1) the defendants are subject to service of process there; and (2) the forum permits "litigation of the subject matter of the dispute." Piper, 454 U.S. at 254 n. 22, 102 S.Ct. 252. As we have earlier observed, the fact that the law of the foreign forum differs from American law "should ordinarily not be given conclusive or even substantial weight," in assessing the adequacy of the forum. Id. at 247, 102 S.Ct. 252.
 
 
 34
 If a court concludes that an adequate alternative forum exists, it then must weigh the public and private interests identified in Gilbert to determine which forum "will be the most convenient and will best serve the ends of justice." Peregrine Myanmar, 89 F.3d at 46. If a district court considers all the Gilbert factors before dismissing a case on forum non conveniens grounds, we accord its decision "substantial deference." See Piper, 454 U.S. at 241, 102 S.Ct. 252.
 
 
 35
 The public interests to be considered include: (1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community. The private interests embrace: (1) ease of access to evidence; (2) the cost for witnesses to attend trial; (3) the availability of compulsory process; and (4) other factors that might shorten trial or make it less expensive. See Piper, 454 U.S. at 241, 102 S.Ct. 252; Gilbert, 330 U.S. at 508, 67 S.Ct. 839.
 
 
 36
 In assessing convenience, there generally is a strong presumption in favor of a plaintiff's chosen forum. See Piper, 454 U.S. at 255, 102 S.Ct. 252. Thus, dismissal usually is not appropriate unless "the balance of convenience tilts strongly in favor of trial in the foreign forum." R. Maganlal & Co. v. M.G. Chem. Co., 942 F.2d 164, 167 (2d Cir.1991). However, this presumption is weaker "when the plaintiff or real parties in interest are foreign." Piper, 454 U.S. at 255, 102 S.Ct. 252; see R. Maganlal, 942 F.2d at 168.
 
 B. Adequate, Alternative Forum
 
 37
 Judge Stanton concluded that England is an adequate forum for plaintiffs' claims. Plaintiffs argue that England is inadequate because: (1) it does not recognize claims under the Sherman Act; (2) it is unclear whether an English court will award damages, and/or treble damages, in an antitrust suit; and (3) it might not recognize some of plaintiffs' common law causes of action.
 
 1. Sherman Act Claims
 
 38
 English courts will not enforce the Sherman Act. See British Nylon Spinners Ltd. v. Imperial Chem. Indus., Inc., [1953] 1 Ch. 19 (Court of Appeal 1952). However, forum non conveniens dismissal is not trumped simply because the foreign forum will apply different substantive law than an American court. See Piper, 454 U.S. at 249, 102 S.Ct. 252; Transunion, 811 F.2d at 129. "The availability of an adequate alternate forum does not depend on the existence of an identical cause of action in the other forum." PT United Can Co. v. Crown Cork & Seal Co., 138 F.3d 65, 74 (2d Cir.1998).
 
 
 39
 Plaintiffs may challenge defendants' allegedly anti-competitive actions under Articles 85 and 86 of the Treaty of Rome, which English courts are bound to enforce. See Case 127/73, BRT v. SABAM, [1974] ECR 51. These provisions are roughly analogous to Sections 1 and 2 of the Sherman Act, and create a private right of action to challenge anti-competitive, monopolistic actions. See Garden Cottage Foods Ltd. v. Milk Mktg. Bd., [1984] 1 AC 130. Given the availability of a cause of action under Articles 85 and 86, we are satisfied that plaintiffs may litigate the subject matter of their Sherman Act claims in England. See PT United Can, 138 F.3d at 74 (dismissal proper although RICO claims could not be brought in alternate forum; fraud claim adequate substitute); Transunion, 811 F.2d at 129-30 (same); see also Howe, 946 F.2d at 952 (dismissal proper although U.S. securities law claims could not be brought in alternate forum).
 
 2. Availability of Money Damages
 
 40
 Plaintiffs also argue that England is inadequate because it is unclear whether an English court will award money damages for a violation of Articles 85 and 86 of the Treaty of Rome. In support of their argument, plaintiffs presented a declaration by Alan Rupert Tyrrell, Q.C., an expert on English law. Tyrrell pointed out that no English court has ever awarded money damages in a suit brought under Articles 85 and 86, and plaintiffs argue that the lack of a certain monetary remedy makes England an inadequate forum.
 
 
 41
 However, Tyrrell also admitted that "[i]n principle the usual remedies of English law, in particular damages, can as a matter of law be awarded in civil actions in an English Court against a[d]efendant who has infringed Article 85 or 86." Moreover, Tyrrell conceded that it is a position "widely held by jurists ... that infringements of Articles 85 and 86 [of the Treaty of Rome] give rise to an action for damages." Indeed, in deciding an interlocutory appeal, the Law Lords of the House of Lords concluded (by a vote of four to one) that damages are available for a violation of Article 86. See Garden Cottage Foods Ltd. v. Milk Mktg. Bd., [1984] 1 AC 130. Although a final judgment was never entered in the case, and the decision is therefore considered dicta, we find the Garden Cottage Foods case highly persuasive on the question of whether monetary damages would be available to plaintiffs in England. Thus, although English courts have not yet awarded damages in an antitrust case, it appears that English courts have the power to do so. See also An Bord Bainne v. Milk Mktg. Bd., [1984] 1 CMLR 519.
 
 
 42
 Plaintiffs also argue that England is inadequate because, even assuming that monetary damages are available, English courts will not award treble damages under the Sherman Act. It is well-established, however, that the unavailability of treble damages does not render a forum inadequate. See Piper, 454 U.S. at 247, 102 S.Ct. 252 (possibility of lower recovery no bar to forum non conveniens ); Transunion, 811 F.2d at 129 (unavailability of RICO treble damages does not render forum inadequate).
 
 3. Common Law Claims
 
 43
 Finally, plaintiffs argue that a number of their common law claims against Barclays UK and Taylor cannot be redressed in the English courts. Specifically, plaintiffs assert that: (1) England does not recognize third-party beneficiary liability for breach of contract; (2) England does not imply a covenant of good faith in every contract; and (3) England does not, as a matter of law, impose a fiduciary duty on banks regarding their customers. In essence, plaintiffs argue that it will be harder for them to recover on their common law claims in England. They concede, however, that England recognizes a number of relevant common law causes of action, including breach of contract, tortious interference, and, in certain circumstance, breach of fiduciary duty by a bank. We believe that the English courts can adequately address the subject matter of plaintiffs' common law claims.
 
 
 44
 As discussed above, a forum may be adequate even if it does not provide a plaintiff with causes of action that are identical to those plaintiff alleged in an American court. See PT United Can, 138 F.3d at 74 (unavailability of certain common law theories of liability does not render forum inadequate); Fitzgerald, 521 F.2d at 453 (even if recovery more difficult in England, forum is adequate); see also Piper, at 254 n. 22, 102 S.Ct. 252 (unfavorable change in law does not preclude forum non conveniens ). Although it appears that plaintiffs might not be able to recover in England on some of their common law claims, the essential subject matter of the dispute can be adequately addressed by an English court.
 
 C. Weighing of Gilbert Factors
 
 45
 Judge Stanton found that the private and public interests involved in this case tilt in favor of trying the action in England. Plaintiffs argue that Judge Stanton abused his discretion in weighing the Gilbert factors.
 
 1. Public Interests
 
 46
 Judge Stanton found that the public interests involved here favor neither New York nor England. He reasoned that New York has an interest in settling a dispute involving Worldcash, a New York corporation, and that England has an interest in resolving a dispute involving two of its major banks.
 
 
 47
 We agree that the public interest factors favor neither forum. Because both jurisdictions have some interest in this dispute, the concern with burdening jurors is not present. See Peregrine Myanmar, 89 F.3d at 47. The problems inherent in applying foreign law also are not implicated because the parties agree that American courts would apply American law and British courts would apply British law to this dispute. Finally, there is no indication that British courts are more or less congested than American courts, or that a judgment issued in either England or the United States would be unenforceable. Thus, Judge Stanton did not abuse his discretion in weighing the public interest factors. See id.
 
 
 48
 Plaintiffs argue that in assessing the public interest factors, Judge Stanton should have taken into account the United States' interest in applying the Sherman Act. See Laker Airways v. Pan American World Airways, 568 F.Supp. 811, 817 (D.D.C.1983) (suggesting that U.S. interest in applying Sherman Act makes forum non conveniens inappropriate). However, we have never held that the United States' interest in applying its laws is a determinative factor to be considered in weighing convenience. See Allstate Life Ins. Co. v. Linter Grp. Ltd., 994 F.2d 996, 1002 (2d Cir.1993) ("United States courts have an interest in enforcing United States securities laws, [but] this alone does not prohibit them from dismissing a securities action on the ground of forum non conveniens"); Cruz, 702 F.2d at 48 (applicability of federal statute does not affect forum non conveniens analysis). Indeed, in Transunion, we upheld the forum non conveniens dismissal of a RICO suit without even suggesting that the district court should have considered the United States' interest in the application of that statute. See Transunion, 811 F.2d at 129.
 
 2. Private Interests
 
 49
 Judge Stanton found that the private interests strongly favor litigation in England. We agree.
 
 
 50
 As Judge Stanton found, most of the witnesses in this case reside in England, and the cost of transporting these witnesses to New York could be enormous. In addition, most of the documentary evidence in the case was created, and is stored, in England. Thus, conducting trial in the United States might impose significant burdens on the parties.
 
 
 51
 Moreover, if this case is tried in the United States, certain witnesses may be unavailable. Plaintiffs' central antitrust allegation against Barclays UK concerns a transaction that involved CCE, CCE's English affiliate Chequepoint UK, Barclays UK and another English bank. The employees of the non-party English bank are: (1) crucial to a trial of plaintiffs' claims against Barclays UK; (2) not subject to compulsory process in the United States; and (3) subject to compulsory process in England. Thus, Judge Stanton properly found that England was a more efficient and effective forum for trial of this dispute.
 
 
 52
 D. Presumption in Favor of Plaintiffs' Choice of Forum
 
 
 53
 Judge Stanton found that the presumption in favor of plaintiffs' choice was weakened in this case because the real party in interest is Chequepoint UK, a foreign corporation. See Piper, 454 U.S. at 255, 102 S.Ct. 252. Plaintiffs argue that Judge Stanton erred by concluding that a weak presumption applied in this case.
 
 
 54
 It is clear that, at bottom, this is a suit about two English banks' refusal to do business in England with CCE and Chequepoint UK. Plaintiffs have attempted to morphose this case into a dispute that concerns the United States by discussing the letter of credit issued by Barclays UK to CCE in New York. However, the letter of credit is a red herring. The gravamen of plaintiffs' claims concern: (1) Barclays UK's alleged ploy to force CCE and Chequepoint UK into default on an English checking transaction; (2) Barclays UK's subsequent refusal to provide banking services in England to CCE and its affiliates; and (3) NatWest UK's refusal to provide banking services in England to CCE and its affiliates. The real parties in dispute with the defendants are CCE and Chequepoint UK.
 
 
 55
 Because the real parties in interest are foreign corporations, there is not a strong presumption in favor of the plaintiffs' choice of forum. See Piper, 454 U.S. at 255, 102 S.Ct. 252. Thus, Judge Stanton properly concluded that England was the correct forum. We note, however, that even if the real parties in interest were American, we would find that Judge Stanton did not abuse his discretion in dismissing this suit, because the private interest factors weigh so substantially in favor of England.
 
 CONCLUSION
 
 56
 Suits brought under the Sherman Act are subject to dismissal under the forum non conveniens doctrine. In this case, Judge Stanton did not abuse his discretion by dismissing the complaint on the ground that England is a more convenient forum. Accordingly, the judgment of the district court is hereby AFFIRMED.
 
 
 
 *
 The Honorable Warren W. Eginton of the United States District Court for the District of Connecticut, sitting by designation