M&I Eastpoint v. Mid-Med Bank          CV-99-411-JD  01/28/00
                UNITED STATES DISTRICT COURT FOR THE
                      DISTRICT OF NEW HAMPSHIRE


M&I Eastpoint Technology, Inc.

     v.                                  Civil No. 99-411-JD
                                         Opinion No. 2000 DNH 025
Mid-Med Bank and HSBC Holdings


                          O R D E R


     M&I Eastpoint Technology, Inc. ("Eastpoint") filed an action

against Mid-Med Bank and HSBC Holdings, alleging breach of a

series of related contracts pertaining to the development,

implementation, and license of a banking software system.  The

defendants have moved to dismiss the action, pursuant to Federal

Rule of Civil Procedure 12(b)(2), contending that the court lacks

personal jurisdiction as to each of them.  In addition, Mid-Med

Bank asks that the suit be dismissed pursuant to the doctrine of

forum non conveniens.


                         Discussion

     In response to a motion to dismiss pursuant to Rule

12(b)(2), the plaintiff bears the burden of establishing personal

jurisdiction.  See Massachusetts School of Law v. American Bar

Assoc., 142 F.3d 26, 34 (1st Cir. 1998).  When, as here, there

has not been an evidentiary hearing, the court proceeds on a

prima facie basis, taking the plaintiff's affirmative allegations

as true and construing them in the plaintiff's favor.  See id.  A plaintiff cannot rely exclusively on allegations in the pleadings, however, but must provide evidence of specific relevant facts.  See Foster-Miller, Inc. v. Babcock & Wilcox Canada, 46 F.3d 138, 145 (1st Cir. 1995).  The court also accepts the defendants' factual allegations to the extent they are uncontradicted.  See Massachusetts School of Law, 142 F.3d at 34.  In considering a prima facie showing, the "court acts not as a factfinder, but as a data collector."  Foster-Miller, Inc., 46 F.3d at 145.

When personal jurisdiction is challenged by a non-resident defendant, "a federal court exercising diversity jurisdiction 'is the functional equivalent of a state court sitting in the forum state.'"  Sawtelle v. Farrell, 70 F.3d 1381, 1387 (1st Cir. 1995) (quoting Ticketmaster-New York, Inc. v. Alioto, 26 F.3d 201, 204 (1st Cir. 1994)).  The court must therefore satisfy both the forum state's long-arm statute and the due process requirements of the Fourteenth Amendment.  See id.  Because New Hampshire's long-arm statute applicable to foreign corporations has been interpreted to be coextensive with the constitutional due process requirements, the scope of personal jurisdiction depends on a due process analysis.  See id. at 1388.

Eastpoint contends that the defendants are subject to

2

specific personal jurisdiction in New Hampshire.  Specific jurisdiction depends on a three-part analysis that examines the defendant's contacts with the forum state in light of the claims at issue in the case.  See Phillips Exeter Academy v. Howard Phillips Fund, 196 F.3d 284, 288 (1st Cir. 1999).  The specific jurisdiction analysis requires the following inquiries:  (1) whether the claim in the case "directly relates to or arises out of the defendant's contacts with the forum[,] . . . [(2)] whether those contacts constitute purposeful availment of the benefits and protections afforded by the forum's laws," and (3) whether the exercise of jurisdiction is reasonable and fundamentally fair in light of the "Gestalt factors."  Id.

A.  Personal Jurisdiction as to Mid-Med Bank

    Mid-Med Bank is a Maltese limited liability corporation that owns and operates approximately fifty bank branches in Malta.  Mid-Med Bank has no offices or operations in New Hampshire.  In March of 1997, Eastpoint, a New Hampshire corporation specializing in the development of client server software applications for the financial industry, learned that Mid-Med Bank had issued a request for proposals for banking software and systems to be used in its Malta operations, and Eastpoint submitted a response.  During the time that Mid-Med

3

Bank evaluated Eastpoint's proposal, between May and October of 1997, Mid-Med Bank employees contacted Eastpoint employees, in New Hampshire, by telephone and facsimile transmission ("fax"). In September of 1997, members of the Mid-Med Bank team evaluating the proposal visited Eastpoint in New Hampshire as part of the evaluation process.

In October of 1997, Mid-Med Bank chose to employ Eastpoint for the project. Mid-Med Bank sent a letter of intent to Eastpoint in New Hampshire on November 3, 1997. The parties negotiated between November of 1997 and February of 1998 through e-mail and correspondence as well as in meetings primarily in Malta. They entered a preliminary agreement, the Heads of Agreement, in February. The project was divided into phases with the first phase consisting of "gap analysis" or a comparison between Mid-Med Bank's needs and current system and Eastpoint's proposed system. Information was gathered in Malta and analysis work was performed in New Hampshire by Eastpoint.

During the gap analysis period, February to July of 1998, the parties negotiated their final agreements through extensive telephone conversations and fax between Malta and New Hampshire. The parties executed the resulting agreements in Malta. The agreements were a professional services agreement for phase one, a professional services agreement for phase two, a computer

software license agreement, and a software maintenance agreement. All of the agreements included choice of law provisions, specifying Malta law. The parties also entered a competency center agreement to permit both parties to generate revenue from licensing the Mid-Med Bank software to third parties.

Mid-Med Bank staff visited Eastpoint on a number of occasions concerning the project. Teams made two visits in July and August of 1998 for the purpose of receiving presentations on the Eastpoint product. In September of 1998, a small team of Mid-Med Bank staff visited Eastpoint for training on product building and administration. Charles Fiorentino, the senior information technology manager for Mid-Med Bank, made visits to New Hampshire, related to the project, in September and December of 1998, and February of 1999. In addition, six Mid-Med Bank employees, and their families, were in New Hampshire from June until October of 1998 for training on the Eastpoint system.

The software was delivered to Mid-Med Bank in March of 1999. On April 12, 1999, Fiorentino and a Mid-Med Bank director traveled to Eastpoint to discuss problems with the software and Eastpoint's performance. On April 16, 1999, Mid-Med Bank abandoned testing the software because of errors. In a letter dated April 28, 1999, Mid-Med Bank's chairman notified Richard Wildung, president of Eastpoint, that unless the complete

software package was delivered by the end of May, Mid-Med Bank would use another supplier to upgrade its system and would hold Eastpoint responsible.

Also in April of 1999, HSBC Holdings announced its intention to acquire a majority interest in Mid-Med Bank. Mid-Med Bank then asked Eastpoint to consent to the transfer of its agreements with Eastpoint to HSBC Holdings, and Eastpoint agreed as long as HSBC Holdings also assumed all obligations owed by Mid-Med Bank to Eastpoint.

Mid-Med Bank continued to be dissatisfied with Eastpoint's performance and their relationship continued to deteriorate. Mid-Med Bank communicated with Eastpoint by letter and telephone. Mid-Med Bank purported to terminate the agreements on June 30, 1999. By contract, the parties were obligated to wait ten days before filing suit. Mid-Med Bank filed suit in Malta, and a few days later Eastpoint filed the present suit in this court.

1. Relatedness.

The first question in the personal jurisdiction analysis is whether the claims in the case are related to or arose out of the defendant's contacts with the forum state, New Hampshire. See Phillips Exeter Academy, 196 F.3d at 288. In the context of a contract action, the court must determine whether "the

6

defendant's contacts with the forum were instrumental either in the formation of the contract or in its breach." Id. at 289. In addition to physical presence in the forum state, a defendant's extensive contacts through communications by telephone, fax, letter, and e-mail are relevant. See id.

Eastpoint alleges breach of the first professional service agreement and, as a result, breach of all of the other agreements including the competency center agreement. Even if the six Mid-Med Bank families who lived in New Hampshire for several months to receive training on Eastpoint's program were not considered,[1] Mid-Med Bank had extensive contacts with New Hampshire that were instrumental to the formation and termination of the contracts at issue. Mid-Med Bank acknowledges visits by Fiorentino and its chairman as well as repeated visits by its staff in the negotiating stages, the implementing stages, and the terminating stages of the agreements. In addition, Mid-Med Bank acknowledges its extensive communications to Eastpoint in New Hampshire throughout the period. Under these circumstances, Eastpoint has demonstrated that its breach of contract claims are related to or

---

[1]Mid-Med Bank contends that the training was unrelated to the contracts at issue in this suit. Eastpoint contends that the training was because Mid-Med Bank wanted to be self-reliant in performing specific project responsibilities and did not relate only to the competency center agreement.

7

arise out of Mid-Med Bank's contacts with New Hampshire.

2. Purposeful availment.

Contacts with a forum that are merely random or fortuitous do not demonstrate a defendant's purposeful availment of the privilege of conducting activities there that would make it foreseeable that it might be haled into court in the forum state, and do not satisfy due process. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474-75 (1985). Instead, personal jurisdiction must be based on a defendant's "purposeful activity related to the forum that would make the exercise of jurisdiction fair, just or reasonable." Sawtelle, 70 F.3d at 1391 (internal quotation omitted). The two focal points of purposeful availment are voluntariness and foreseeability. See Nowak v. Tak How Invs., Ltd., 94 F.3d 708, 716 (1st Cir. 1996).

a. Voluntariness.

Voluntary actions are not based on the unilateral actions of another party or a third person, but are the defendant's own activities directed at the forum. See id. To be voluntary, the defendant must reach out to the plaintiff's state to create a relationship, not merely accept a relationship tendered from the state. See Phillips Exeter Academy, 196 F.3d at 292.

8

In this case, Mid-Med Bank accepted the proposal by Eastpoint, tendered from New Hampshire, and then engaged in extensive negotiations with Eastpoint in New Hampshire to arrive at the agreements, including sending its employees to New Hampshire. The software project, which was to be implemented and used in Malta, was to be developed, at least in part, in New Hampshire. After the agreements were signed and then as the relationship between Mid-Med Bank and Eastpoint deteriorated, Mid-Med Bank continued its contacts with New Hampshire by communicating and sending employees to New Hampshire to deal with Eastpoint about the project. If Mid-Med Bank had merely entered the contract for the software system tendered to it by Eastpoint from New Hampshire, to be delivered and implemented in Malta, without sending employees or otherwise involving itself in the development and training process in New Hampshire, it is possible that its non-tangible contacts would not be sufficiently voluntary to support jurisdiction. Mid-Med Bank's contacts with New Hampshire, however, show that it voluntarily conducted activities in the state for the purpose of benefitting from a contractual relationship with Eastpoint. See, e.g. Pritzker v. Yari, 42 F.3d 53, 62-63 (1st Cir. 1994); Fairview Mach. & Tool Co. v. Oakbrook Int'l, Inc., 56 F. Supp. 2d 134, 139 (D. Mass. 1999).

9

b. Foreseeability.

The foreseeability factor relates to whether the defendant's contacts with the forum state are "such that he should reasonably anticipate being haled into court there." Nowak, 94 F.3d at 716. When a defendant has deliberately engaged in significant activities in the forum state and has purposefully directed its commercial activities to the state, it is reasonably foreseeable that it may be subject to suit in that state. See Burger King, 471 U.S. at 474-76.

Mid-Med Bank was well aware that it was dealing with a New Hampshire corporation in New Hampshire. Although the agreements were ultimately signed in Malta and are subject to Malta law, a considerable amount of activity concerning the agreements and the project occurred, with Mid-Med Bank's participation, in New Hampshire. Due to the extent of its activity in New Hampshire, through a two-year relationship with a New Hampshire company, Mid-Med Bank could reasonably have foreseen being subject to suit in New Hampshire.

3. The Gestalt factors.

The final test of whether the exercise of personal jurisdiction comports with the requirements of due process depends upon the reasonableness and fairness of subjecting the

10

defendant to suit in the forum state. See Nowak, 96 F.3d at 717. The factors used to assess whether jurisdiction comports with fair play and substantial justice under the circumstances of a particular case are:

> (1) the defendant's burden of appearing, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the judicial system's interest in obtaining the most effective resolution of the controversy, and (5) the common interests of all sovereigns in promoting substantive social policies.

Id. (quoting United Elec. Workers v. 163 Pleasant St. Corp., 960 F.2d 1080, 1088 (1st Cir. 1992)). Fairness is assessed on a sliding scale so that a weak showing on the first two prongs of the personal jurisdiction analysis puts a lighter burden on the defendant to show that jurisdiction here would be unreasonable or unfair. See id. at 717. In contrast, "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Burger King, 471 U.S. at 477. Here, Mid-Med Bank's showing of relatedness and purposeful availment is neither particularly strong nor particularly weak, and therefore the gestalt factors are not likely to tip the balance against imposing jurisdiction in this case.

Mid-Med Bank, which bears the burden with respect to the

11

effect of the gestalt factors, did not address the factors at all, and instead argued under the doctrine of forum non conveniens that the case should be litigated in Malta rather than New Hampshire.  Eastpoint argues that Mid-Med Bank has not shown any unusual burden of appearing in New Hampshire, that New Hampshire has an interest in protecting its corporations from the actions of foreign corporations, that New Hampshire is the most convenient forum for it to obtain relief, and that the differences in procedures and expected delays in the Malta court system will prejudice Eastpoint.

The court is mindful that the factors applicable to personal jurisdiction and forum non conveniens are distinct and are not to be conflated into a single analysis.  See Foster-Miller, 46 F.3d at 150.  Therefore, based on Eastpoint's showing on the relatedness and purposeful availment steps of the personal jurisdiction analysis, and after considering the fairness and reasonableness of asserting personal jurisdiction over Mid-Med Bank in this case in light of the gestalt factors, the court concludes that Mid-Med Bank is subject to personal jurisdiction in New Hampshire.[2]

---

[2]The court notes that the pending parallel litigation in Malta, involving the same dispute that is at issue in this case, raises a question as to whether the court would abstain and stay

12

B.  Personal Jurisdiction as to HSBC Holdings

HSBC Holdings, a British corporation and majority shareholder in Mid-Med Bank, moves to dismiss for lack of personal jurisdiction.[3]  Eastpoint does not assert that HSBC Holdings had minimum contacts of its own with New Hampshire sufficient to support personal jurisdiction.  Instead, Eastpoint contends that in becoming the majority shareholder of Mid-Med Bank, HSBC Holdings agreed to assume Mid-Med Bank's rights and obligations under the agreements with Eastpoint.  As a result, Eastpoint argues, personal jurisdiction over HSBC Holdings is properly based on Mid-Med Bank's contacts with New Hampshire as Mid-Med Bank's assignee.[4]

---

the action in favor of the Malta litigation.  See, e.g., Finova Capital Corp. v. Ryan Helicopers U.S.A., 180 F.3d 896, 898 (7th Cir. 1999).  Although an issue of abstention may be raised sua sponte by the court, in this case the court declines to consider a difficult issue not addressed by the parties.  See Pustell v. Lynn Public Schs., 18 F.3d 50, 51 n.1 (1st Cir. 1994).

[3]HSBC Holdings is also referred to as HSBC Group.

[4]Eastpoint does not assert a particular theory of successor liability under New Hampshire law but instead relies on an unpublished decision from the Eastern District of Louisiana for the proposition that "an assignee who had never executed a contract with plaintiffs was nonetheless subject to the Court's jurisdiction as an assignee."  Pl. mem. at 14.  The court in Gulf Coast Music, L.L.C. v. Ace Records Ltd., 1999 WL 169473 (E.D. La. March 24, 1999), found personal jurisdiction existed as to one

In support of its theory of jurisdiction based on the assignment of obligations, Eastpoint relies on two letters between Eastpoint and Mid-Med Bank.  On May 14, 1999, Charles Fiorentino of Mid-Med Bank wrote to Richard Wildung of Eastpoint notifying Eastpoint of the sale of the majority interest in Mid-Med Bank by the government to HSBC Holdings.  In the letter, Fiorentino asked: "Please confirm in writing, that you have no objection, and consent, to the transfer of all software licences from Mid-Med Bank plc to HSBC Group in terms of the agreements signed between us to date."  Wildung responded that Eastpoint had no objection "[p]rovided that HSBC Group assumes all outstanding obligations of Mid-Med to [Eastpoint]."  Eastpoint submits no confirmation from HSBC Holdings or Mid-Med Bank that HSBC Holdings did, in fact, agree to assume all of the outstanding obligations of Mid-Med to Eastpoint.

HSBC Holdings denies that it assumed the obligations and liabilities of Mid-Med Bank to Eastpoint under their disputed agreements.  HSBC Holdings's solicitor in London said in his affidavit, "Holdings did not agree to assume any obligations of Mid-Med under its contracts with Eastpoint."  The solicitor also

defendant based on an assignment of rights in an agreement from another entity and the defendant's own contact through royalty payments.  See id. at *2 n.4.

14

said, "Holdings was never contacted by Mid-Med or Eastpoint (so far as I have been able to discover after due enquiry) with regard to any assumption of obligations of Mid-Med to Eastpoint. Holdings is not an assignee of Mid-Med's contracts with Eastpoint, nor did Holdings ever agree to assume any of Mid-Med's obligations under the contracts."

Based on the record presented on the issue, Eastpoint has not presented a prima facie case that HSBC Holdings assumed the liabilities and obligations of Mid-Med Bank to Eastpoint under their agreements. Eastpoint also has not shown under applicable law that personal jurisdiction could be based on such an assignment, if it had occurred, or that HSBC Holdings would be subject to successor personal jurisdiction under any other recognized theory. See, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 266 (1st Cir. 1997); Saco River Tel. & Tel. v. Shooshan & Jackson, 826 F. Supp. 580, 582-83 (D. Me. 1993). Therefore, Eastpoint has not sustained its burden to present a prima facie case on its theory of specific personal jurisdiction. HSBC Holdings is dismissed from the case for lack of personal jurisdiction.[5]

_____

[5]The court notes that Eastpoint asked for discovery to garner additional factual support for its assignment theory. Given the resolution of the issue of forum non conveniens with

15

C.  Forum Non Conveniens

Mid-Med Bank contends that under the doctrine of forum non conveniens the suit here should be dismissed in favor of the pending litigation in Malta.  The common law doctrine of forum non conveniens, rather than 28 U.S.C.A. § 1404(a), applies when, as here, the alternative forum is in a foreign country.  See, e.g., Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 722 (1994); Capital Currency Exchange, N.V. v. National Westminster Bank PLC, 155 F.3d 603, 607 (2d Cir. 1998).  Under the common law theory of forum non conveniens, a strong presumption in favor of a plaintiff's forum choice means that "the defendant must bear the burden of proving both the availability of an adequate alternative forum and that considerations of convenience and judicial efficiency strongly favor litigating the claim in the alternative forum."  Nowak, 94 F.3d at 719.

1.  Alternative forum.

The first consideration, the availability of an adequate

respect to Mid-Med Bank, additional discovery on the personal jurisdiction issue is moot.  Contrary to Eastpoint's argument, HSBC Holdings did not waive the issue of forum non conveniens by initially failing to join in Mid-Med Bank's motion.  See, e.g., Leif Hoegh & Co. v. Alpha Motor Ways, Inc., 534 F. Supp. 624, 626 (S.D.N.Y. 1982).

16

alternative forum, depends on whether the defendant is amenable to process elsewhere and whether the plaintiff's claims may be adequately addressed in that forum. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255 n.22 (1981). Mid-Med Bank contends that Malta, its residence and the forum where its breach of contract action is pending, is an adequate alternative forum. Mid-Med Bank is amenable to process in Malta, having brought suit on the same claims there. The forum may still be inadequate "even though the defendant is amenable to process, if 'the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all.'" Mercier v. Sheraton Int'l, Inc., 981 F.2d 1345, 1350 (1st Cir. 1992) (quoting Piper Aircraft, 454 U.S. at 254; internal citation omitted).

Eastpoint objects to Malta, asserting that limitations in Maltese substantive law and procedure would preclude the remedy it seeks against Mid-Med Bank and would not allow a fair hearing of its claims. Specifically, Eastpoint contends that Malta does not recognize a cause of action for quantum meruit or provide for discovery depositions, and that likely delays in the proceedings will prejudice its case. Eastpoint and Mid-Med Bank each present the affidavit of their Maltese counsel to address issues of Maltese law and civil procedure.

17

Dr. Eric Mamo, Mid-Med Bank's counsel, discusses provisions of the Maltese Code of Organisation and Civil Procedure and the Maltese Civil Code in his affidavit.[6] Dr. Mamo gives his opinion that all of the remedies Eastpoint seeks in its complaint in this court would be available under Maltese law, including the quantum meruit claim. Dr. Mamo says, "Additionally, a party may seek relief in the form of quantum meruit damages under provisions governing termination of contracts of works and under a general action requiring compensation in cases of unjustified enrichment." In addition, Dr. Mamo gives his opinion that Eastpoint would be able to bring its claims either as counterclaims in the suit already pending or in a separate suit, although a separate suit might be consolidated with the pending action.

With respect to discovery, Dr. Mamo reports that discovery of non-privileged relevant documents is provided in the rules and that a party may request court assistance in discovery, if necessary, but does not address the availability of discovery depositions. Dr. Mamo explains that trial of a case proceeds

---

[6]Mid-Med Bank has not provided copies of the cited Maltese rules or law nor do Maltese legal sources appear to be available through Lexis or Westlaw. See Fed. R. Civ. P. 44.1; cf. Mercier, 981 F.2d at 1351 (noting court's review of Turkish law comported with affidavits).

18

through hearings during which the plaintiff first presents its case by calling witnesses with cross-examination by the defendant and the defendant's case follows. The parties then argue their cases or submit written pleadings. Judgment is rendered by the court as no jury trial of civil cases is provided in Malta.

Dr. Henri Mizzi, on behalf of Eastpoint, contends that Malta recognizes remedies for breach of contract but not for quantum meruit. Dr. Mizzi says that if Eastpoint does not prove that Mid-Med Bank improperly terminated the contract, it will have no remedy for any benefit Mid-Med Bank may have received from the software or the project. Dr. Mizzi explains that although the rules of civil procedure provide for discovery and subpoena of witnesses, the system does not usually implement the procedures. He notes that cases are heard in a series of short hearings or appointments although he acknowledges that special arrangements are made so that foreign witnesses can be heard at one sitting rather than in multiple hearings. In sum, Dr. Mizzi believes that the case in Malta will be subject to delays and "is likely to linger in the Courts of Malta for many years prior to achieving final resolution."

Beginning with the issue of the availability of a quantum meruit remedy in Malta, Eastpoint acknowledges that it is not established that a quantum meruit remedy is unavailable, but is

only "not clear" whether such a remedy exists.  Since counsel for Mid-Med Bank has stated in his affidavit that the remedy is available, it is unlikely that Mid-Med Bank would challenge a quantum meruit claim as unavailable under Maltese law.  In addition, it is undisputed that remedies are available for breach of contract under Maltese law, which is not "so clearly inadequate or unsatisfactory that [the contract remedy] is no remedy at all."  Piper Aircraft, 454 U.S. at 254; accord Mercier, 981 F.2d at 1352 n.5; see also Dowling v. Richardson-Merrell, 727 F.2d 608, 615 (6th Cir. 1984); Evolution Online v. Koninklijke Nederland N.V., 41 F. Supp. 2d 447, 451 (S.D.N.Y. 1999).

Many courts have held that restrictions on discovery, including the unavailability of discovery depositions, do not render an alternative forum inadequate.  See Mercier, 981 F.2d at 1352-53 (citing cases); Marra v. Papandreou, 59 F. Supp. 2d 65, 73-74 (D.D.C. 1999) (citing cases).  Therefore, Eastpoint's concerns about discovery procedures and the absence of discovery depositions under Maltese procedure do not undermine the adequacy of Malta as an alternative forum.

With respect to delays in the Maltese system, to be meaningful in the context of whether the alternative forum is adequate, the delay must be so extreme as to essentially deprive the plaintiff of a remedy.  See Bhatnagar v. Surrendra Overseas

20

Ltd., 52 F.3d 1220, 1227-28 (3d Cir. 1995).  Dr. Mizzi, on behalf of Eastpoint, predicted that Mid-Med Bank's case would linger for many years before resolution.  Dr. Mizzi also explained that cooperation by the parties and through special arrangements could expedite matters.  Even in this court, a complex commercial case involving the development and implementation of a software application for a banking system would not be likely to proceed from filing through judgment in less than a year.  In fact, patent litigation, which may raise comparable technical and legal issues, could proceed in this court for many years.  Under the circumstances presented, it does not appear that delays in the Maltese system are likely to be so extenuated as to deprive Eastpoint of any remedy.

2.  Convenience.

The second step of the forum non conveniens analysis requires consideration of "whether the alternative forum is sufficiently more convenient for the parties as to make transfer necessary."  Mercier, 981 F.2d at 1354.  Relevant considerations consist of factors pertaining to the private and public interests implicated by litigation in the alternative forum.  See Nowak, 94 F.3d at 719.  Private interest factors include the "relative ease of access to sources of proof, availability of compulsory

21

process, comparative trial costs, ability to enforce a judgment, 'and all other practical problems that make trial of a case easy, expeditious and inexpensive.'" Id. (quoting Gulf Oil Co. v. Gilbert, 330 U.S. 501, 508 (1947)). "'Public interest' factors include the practical difficulties of unnecessarily imposing upon a busy court the obligation to hear a case more fairly adjudicated elsewhere, the imposition on jurors called to hear a case that has no relation to their community, and the familiarity of the court with applicable laws." Id.

    a.  Private interest factors.

While pertinent witnesses are in both places, more witnesses are in Malta; documentary evidence is kept in both places; and both parties have the relevant software. Information for the "gap analysis" that Mid-Med Bank contends was the basis for the software system was gathered in Malta, but was partly analyzed in New Hampshire. The software was tested in Malta, so that witnesses and evidence pertaining to testing would be there. Mid-Med Bank also asserts that witnesses and evidence pertinent to Eastpoint's claim that the sale of Mid-Med Bank's stock motivated its termination of the agreement would be in Malta. Therefore, based on the parties' submissions, access to evidence and sources of proof is not significantly different in New Hampshire and Malta but is likely to favor Malta.

22

Eastpoint contends that even if Maltese nonparty witnesses are not subject to compulsory process in New Hampshire, there is no evidence that they would not agree to testify or be deposed. A defendant is not obligated to prove that a foreign witness will be unavailable or the significance of his expected testimony. See Mercier, 981 F.3d at 1356; but see Scott v. Jones, 984 F. Supp. 37, 48 (D.Me. 1997) (noting lack of indication that foreign witness, not subject to compulsory process, would refuse to appear at trial). It also is open to question whether deposition testimony would provide an adequate substitute for live testimony in all cases. See Mercier, 981 F.2d at 1356. Therefore, the lack of compulsory process in New Hampshire as to some of Mid-Med Bank's witnesses is significant.

Eastpoint argues that it would incur greater expense in litigating its case in Malta than Mid-Med Bank would in litigating here. The expenses in either case will likely be both significant and mutual. Because Mid-Med Bank's suit is already pending in Malta, Eastpoint will incur expenses in litigating there regardless of whether its suit proceeds here. In fact, with an eye to economy, one suit would be less expensive than two, and Eastpoint can hardly rely on the cost of litigation when it has chosen to increase rather than minimize the cost.

In sum, the private interest factors tip in favor of the

suit in Malta, but do not strongly favor either forum.  Absent a strong showing of private interest in favor of the alternative forum, the court ordinarily would not disturb the plaintiff's choice of forum.  See Mercier, 981 F.2d at 1354.  A plaintiff's choice of forum is entitled to much less weight, however, when, as here, suit is brought after an action is filed in the alternative forum.  See MLC (Burmuda) Ltd. v. Credit Suisse First Boston Corp., 46 F. Supp. 2d 249, 254 (S.D.N.Y. 1999).  Therefore, Eastpoint's choice to proceed in New Hampshire is not dispositive.

        b.  Public interest factors.

        The public interest factors focus on the relative convenience and efficiency of litigation in the local forum versus the foreign forum.  Both Malta and New Hampshire have an interest in the litigation that is pending in both places.

Mid-Med Bank is a Malta corporation and the software product and banking system at issue were to operate in approximately fifty Mid-Med Bank branches in Malta.  Malta has significant interests in Mid-Med Bank, which is located in Malta, serves that community, and employs members of the community.[7]  Malta also has

_____

        [7]In addition, it appears from the record that Malta may have owned a significant number of shares in Mid-Med Bank during the contract period.

24

significant interests in the enforcement of contracts entered in Malta by Maltese companies for projects to be performed in Malta.

Eastpoint developed the software product at its company location in New Hampshire, giving New Hampshire an interest in the well-being of a New Hampshire corporation and its employees. Eastpoint employees also did significant work on the project in Malta and elsewhere. In addition, Eastpoint undertook the Mid-Med Bank project knowing it was dealing with a Malta company for a project to be implemented in Malta. Comparatively, Malta's interest is significantly greater than New Hampshire's interest. For the perspective of a New Hampshire jury, if the case were tried to a jury, while some connection exists to the New Hampshire community, the case has a more significant relationship with Malta.

Neither this case nor the case pending in Malta has progressed beyond the initial stages. Eastpoint, through its counsel Dr. Mizzi, shows that the pertinent court docket in Malta is busy. As noted previously however, dismissal of this case in favor of the case pending in Malta, where Eastpoint is already a party and could bring its claims as counterclaims, would not add to the docket in Malta. In contrast, if Eastpoint's suit is maintained here, both this court and the Malta court will hear and decide essentially the same case based on the same evidence

and the same witnesses, although the Malta court may have better access to both evidence and witnesses. Duplicate parallel litigation would mean a duplication of effort by the courts and the related additional burdens and costs incurred by the parties and their counsel. Interests of both the parties' convenience and judicial economy favor dismissing the suit in this court in favor of the proceeding in Malta. See MLC (Bermuda) Ltd., 46 F. Supp. 2d at 252-54.

Although the application of Maltese law in this court, pursuant to the parties' choice of law provisions in their agreements, is not a consideration to be given undue weight, it adds to the public interest in favor of litigation in Malta. See Nowak, 94 F.3d at 720-21; Mercier, 981 F.2d at 1357.

An alternative adequate forum for Eastpoint's claims exists in Malta. Under the circumstances of this case, evaluated in light of the private and public interest factors, the propriety and benefits of litigating the parties' dispute in the Malta action outweigh Eastpoint's interest in litigating its claims in New Hampshire. Therefore, it is appropriate to dismiss Eastpoint's claims against Mid-Med Bank based on the doctrine of forum non conveniens. Since Eastpoint has not requested that the dismissal include any conditions to protect its interests in the Malta litigation, cf. Mercier, 981 F.2d at 1352, the court does

26

not consider imposing conditions on the dismissal.

## Conclusion

For the foregoing reasons, Mid-Med Bank's motion to dismiss (document no. 18) is denied as to personal jurisdiction, but is granted as to forum non conveniens. HSBC Holdings's motion to dismiss (document no. 17) is granted due to lack of personal jurisdiction. HSBC Holdings's assented to motion to file a reply memorandum (document no. 22) is granted, and the memorandum was considered with the other submissions. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
District Judge

January 28, 2000

cc:  George R. Moore, Esquire
     Nancy J. Felsten, Esquire
     Wilbur A. Glahn III, Esquire

28